David *v.* Veitscher Magnesitwerke Actien Gesellschaft, Appellant.

Argued November 26, 1943. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

*Earl G. Harrison,* of *Saul, Ewing, Remick & Harrison,* with him *Harry E. Sprogell,* for appellant.

*Samuel A. Goldberg,* with him *Wolf, Block, Schorr & Solis-Cohen,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, January 3, 1944:

The court below entered a judgment for the plaintiff, Dr. Michael David, for $9,798.46 with interest, for want of a sufficient affidavit of defense as to part of a claim and sustaining plaintiff's reply raising questions of law to new matter included in the affidavit of defense. From this judgment the defendant, Veitscher Magnesitwerke Actien Gesellschaft (hereinafter referred to as VMAG) takes this appeal.

The action was begun on May 18, 1939, by writ of foreign attachment garnisheeing moneys belonging to VMAG, totaling approximately $21,000. The claim was for the payment of a fixed sum set forth in an account stated by VMAG on a contract of employment embodied in various letters and minutes of the Executive Committee of VMAG attached to the pleadings.

VMAG is engaged in the business of producing and selling magnesite and similar chemicals, and was incorporated under the laws of the ci-devant nation of Austria and has its principal place of business at Vienna. On March 15, 1938, Austria was absorbed by the Third German Reich.

Dr. David, a citizen of Rumania, was employed as a director of the VMAG and served as general manager at its main office in Vienna from about December 21, 1925, to May 1, 1938. In the letter and minutes his employment was extended from time to time, and on April 28, 1936, it was extended "for an indefinite period so that it may be terminated at intervals of six months on the 30th day of June and the 31st day of December in each year, in which case Dr. David shall receive contractual

dismissal pay in the sum of a year's salary," which in 1938 was 86,160 schillings. On October 4, 1937, the executive committee agreed that "in the event that the service relationship with Dr. David shall be terminated by the Company, he will receive a pension of 2000 schillings monthly, beginning with the month following the end of the service relationship." On April 28, 1938, the service relationship with Dr. David was terminated by the Company as of December 31, 1938, but excusing him "from further service from May 1, 1938, for the entire duration of the notice period, that is, up to December 31, 1938." In the same letter they expressly stated an account, thereby creating a fixed debt, as follows:

". . . There will be, therefore, the following payments made on April 30, 1938:

| | |
|---|---|
| 8 monthly salaries after the deduction of social insurance . . . . . . . . | S. 52,695.12 |
| Christmas remuneration for 1938 . . | S. 6,627.69 |
| 50% of the contractual dismissal pay, which is established at 1 year's salary . . . . . . . . . . . . . . . . | S. 43,080.00 |
| Gross Sum . . . . | S.102,402.81 |

There will be deducted with a view to the computation of the yearly budget for 1938 and the tax computation in accordance with Section 175 of the Tax Law as to dismissal pay:

| | | |
|---|---|---|
| Tax on Salaries . . . | S. 10,120.28 | |
| Crisis and security Taxes . . . . . . . . . . | S. 8,844.81 | S.18,965.09 |

| | |
|---|---|
| There will remain, therefore, a payment of . . . . . . . . . . . . . . . . . . | S.83,437.72 |
| of Reichsmarks . . . . . . . . . . . . . . | 55,625.14 |

the settlement of which we are ordering."

In this account they also stated: ". . . You will be entitled to participate in social insurance until December 31, 1938. On January 2, 1939, the other half of the dismissal pay as well as the first monthly installment of your pension in the sum fixed by agreement will fall due." They also said in this letter that "All laws which will be newly introduced with regard to the dismissal pay and pension will have to be taken into consideration at the time of payment on January 2, 1939." It is for "the other half" of the one year's salary and for the monthly pension payment which they contracted for in 1936 and upon which the statement of account of 1938 is founded, this suit was brought.

The plaintiff pleaded that three Austrian schillings have the value of two Reichsmarks and a Reichsmark is stated to be of the value of 40-1/8 cents in international exchange for conversion into the currency of the United States. The plaintiff claimed 53,080 schillings which he averred was equivalent to 35,386-2/3 Reichsmarks or the sum of $14,198.89. VMAG answered that the schillings claimed by the plaintiff are equivalent to $9,798.46. The judgment was computed in accordance with VMAG's allegations concerning the value of the schillings and the actual valuation above that expressly admitted remained to be determined by trial.

VMAG's "defense is that following absorption of Austria into the Third German Reich there became effective and binding in Austria, where VMAG's business is conducted, where plaintiff worked for VMAG, and where the contract sued upon was made and to be performed, laws which extinguished plaintiff's alleged cause of action and which made impossible the payments which plaintiff now seeks to compel. These laws were promulgated by the German Government of Austria." The first of these is a Decree to exclude Jews from the German economic life, dated at Berlin November 12, 1938, and executed by "Goering General Field Marshal", the commissioner in charge of the Four Year plan. It

became effective in Austria on November 15, 1938, and provided in part that "(1) After January 1, 1939, a Jew may not be a Manager (Betriebsfuehrer) in the sense of the law of January 20, 1934 regulating national labor (Reichsgesetzbl. I S. 45). (2) If a Jew is active as a managing executive in a business establishment he may be given six weeks to quit. Upon the expiration of the period of notice all rights based on the contract are extinguished, particularly the right to pensions and cancellation settlements." VMAG pleaded that the plaintiff was a manager within the meaning of this law of January 20, 1934, and that he had been given due dismissal notice expiring prior to January 1, 1939. The second law was one on Foreign Exchange Control, which became effective in Austria about December 16, 1938, and provided in part that "Only subject to the issuance of a permit may an 'inlander' within the 'inland' (German Reich), make payments to a foreigner or in favor of a foreigner to an 'inlander', or in 'inland' or foreign payment media to a foreigner or, in favor of a foreigner, or an 'inlander'." VMAG averred that it is and always has been impossible for it to obtain such a permit. The third of these laws became effective about January 15, 1940, and designated persons resident in the United Kingdom of Great Britain as enemies and forbade any payment to them. Dr. David was such a resident.

On April 30, 1940, upon the plaintiff's rule for judgment, the court below held that the matters pleaded in the affidavit of defense were insufficient in law, except for the question concerning the value of the Austrian schilling, and judgment was duly entered.

In affirming this judgment, as we do, we are not concerned with the question whether German domination of Austria is of a de facto or de jure status, or whether or not our government by official decree recognizes Germany's sovereignty over Austria; or the extraterritorial force of any laws or decrees promulgated by the German government for Austria. We are concerned solely with

the pleadings, and for the purposes of this appeal we assume the truth of the averments in the affidavit of defense and the "new matter" contained therein. We accept as true the allegations in the "new matter" that General Field Marshal Goering's decree, prohibiting any Jew from holding the position of business manager in Austria after January 1, 1939, and requiring that one "active as a managing executive may be given six weeks notice to quit, and upon expiration of the period of notice all rights based on the contract are extinguished particularly the right to pensions and cancellation settlements," became effective throughout Austria. That the Foreign Exchange Regulations, and the decree upon treatment of enemy property likewise became effective throughout Austria, we also accept as a fact. The question before us is the effect of these decrees and laws upon the plaintiff's claim against VMAG. The defendant says they "have extinguished plaintiff's cause of action and have made impossible compliance by VMAG with its former contractual liabilities, . . ." The plaintiff contends that "they do not actually apply in this case at all."

The liability of VMAG to the plaintiff became fixed not by virtue of the writing of April 28, 1938, terminating the employment but by virtue of the agreements of April 28, 1936, and October 4, 1937. These created a liquidated debt. This debt was sufficient consideration for the new cause of action created on April 28, 1938, when VMAG stated an account in writing of this liability to the plaintiff and paid him all but the "remaining 50% of the contractual dismissal pay, which is established at one year's salary," and the monthly installment of his pension. The effect of this account stated is that ". . . a new duty arises to pay a sum so fixed.": Restatement, Contracts, Sec. 422.

In *South Side Trust Co. v. Washington T. P. Co.*, 252 Pa. 237, 242, 97 A. 450, we said that ". . . the gist of [an account stated] consists in an agreement to, or acquies-

cence in, the correctness of the account, so that in proving the account stated, it is not necessary to show the nature of the original transaction, or indebtedness, or to set forth the items entering into the account. Where the evidence tending to show the statement of account is not in dispute, the question as to whether the transaction amounts to an account stated, is for the determination of the Court . . ." Here the statement of the account is not challenged. The defendant disputes only the effect of the subsequent words "Will fall due" in this statement as they relate to the other half of the dismissal pay and the right to the installment of the pension. But these words are impotent to affect the then existing obligation as to the balance of the sum so fixed, or to affect the promised pension. Later laws in the form of dictatorial decrees or otherwise could not affect rights and obligations already matured. "It is the holding of all of the Pennsylvania cases, which we have cited, that, when an employee who is a member of any retirement system, whether it affects policemen, firemen, school teachers, or other public employees, has fully complied with all the requirements making him eligible to a retirement allowance, whether he chooses to ask for it then or later, *he has a vested right to such allowance which cannot be adversely affected by subsequent legislation,* except for a cause which we will refer to hereinafter. Until the employee has become eligible, as stated by these decisions, his right to the retirement allowance is inchoate and it may be affected by subsequent legislation. Such is also the holding of *Roddy v. Valentine,* 286 NY 228, 197 NE 260, supra; *Kieran v. Hunter College Ret. Board,* supra (255 App. Div. 378, 7 NYS (2d) 612) ; *Cox v. McElligott,* 163 Misc. 619, 298 NYS 805. See also, *Hammitt v. Gaynor* (Sup. Ct.) 144 NYS 123 :" (Italics supplied). *Talbot v. Independent School Dist.,* 230 Iowa 949, 299 N. W. 556, 137 A. L. R. 234, 243. In the *Kieran v. Hunter College* case, the Court said : "A retirement pension is in the nature of pay withheld to induce continued faith-

ful service. It amounts to compensation for services previously rendered." The principle thus stated just as aptly applies to private employees. *Langer v. Super. Steel Corp.,* 105 Pa. Superior Ct. 579, 161 A. 571. See also *Schofield v. Zion's Co-op. Merc. Inst.,* (Utah) 39 P. (2d) 342, anno.: 96 A. L. R. 1094.

What is the effect of the Goering decree upon the plaintiff's claim as pleaded? If we treat the plaintiff's claim as a cause of action for the payment of a fixed sum on an account stated, the decree is inapplicable. The decree is entitled a "Decree to Exclude Jews from the German Economical Life, of November 12, 1938". Its effective date was January 1, 1939. We can find nothing in Section 2 of this decree upon which the defendant relies that affects a liquidated debt in an account stated. We agree with the appellee's contention that "the whole status between the plaintiff and the defendant on the date of that decree was *merely that of creditor and debtor.*" The terms of that decree did not in any manner affect VMAG's obligation to Dr. David any more than it could have affected a promissory note held by Dr. David.

Even if we treat the cause of action as one based on a contract of employment, this decree would not affect it. The parties here terminated the plaintiff's employment under his contract more than six months before the decree. Eleven days after the employment's termination, i. e. on May 9, 1938, plaintiff was no longer a resident of Austria but of Great Britain. We agree with the court below that ". . . the decree does not by its own terms apply to one whose employment had been effectively terminated prior to its promulgation and whose rights had been fixed pursuant to contract between the parties." The language of the decree pleaded by VMAG is plain. What the applicable "law" is, is not a question of fact to be litigated, for the "law" appears in the defendant's pleadings. If the meaning of the language of a statute is doubtful or if it was doubtful as to whether

or not the act affected a party to the proceedings, we would then have a question of fact which would have to be determined upon trial: *Holzer v. Deutsche Reichsbahn-Gesellshaft*, 277 N. Y. 474, 14 N. E. (2) 798. The appellant argues that when it pleaded the statute it pleaded its defense sufficiently. We do not accept this contention. In the *Bank of American National Trust & Savings Assn. v. Sunseri*, 311 Pa. 114, 166 A. 573, we said: "All these averments are bad. What the statutes of a sister state are is a question of fact, and the statute itself, as printed in the authorized pamphlet laws of the state, are the best evidence of that fact. Hence the place in the pamphlet laws should be given and the language of the statute should be quoted. *If the meaning of the statute is doubtful, and there is a decision of the court of last resort in the state clarifying the situation, it should be cited.* These two matters being capable of exact determination, *the opinions even of lawyers regarding them* is inadmissible. If the subject had related to the common law of the state, not to be found in its pamphlet laws, a statement to that effect might let in the opinion of lawyers of the state, but here the averments relate to the 'Statutory Law of California,' and the Supreme Court's construction thereof, and to them only." (Italics supplied). In *Moscow Fire Insurance of N. Y. v. Bank of New York & Trust Co.*, 280 N. Y. 286, 20 N. E. (2) 758 (1939), the New York Court of Appeals said: "Opinions of expert witnesses will not control the judgment of a judge in regard to foreign law except to the extent that it is a reasonable inference from statute or from precedent or from the implications of a legal concept, such as contract or testament or juristic personality. (Citing cases.) Unless it is this, the judge must use his own judgment and find the meaning of the foreign law as he would if the meaning to be ascertained were that of a deed or an agreement. This is as true upon appeal as it is upon a trial . . . ."

Civilized men and nations look upon such a decree as Goering's as dishonest and brutal, and contrary to the natural dictates of justice. The rights which this decree attempt to destroy are those which our Declaration of Independence and the organic laws of this nation and of this state declare to be inalienable.[1] This Goering decree is characteristic of despotic governments of men but not of governments of law. However, American judges and statesmen recognize the impracticability of our nation's attempting to impose on less civilized or uncivilized nations our own conceptions of right and justice in that nation's treatment of its own nationals.[2] To do so would require force; force means war, and nations do not customarily go to war to protect *other* peoples from the oppressions of *their own* governments but only to protect *their own* people from the violence and aggressions of other nations. Since every government is sovereign within its own territorial limits, and since no independent nation is subject to any limitations, except those self-imposed, in the treatment of its own people it would be a vain thing for the courts of one nation to sit in judgment upon the validity of the acts of another nation done to that country's own people in that nation's

---

[1] As a matter of historic interest it may be noted that in August 1789 the National Assembly of France proclaimed certain principles which were afterwards included in the French Constitution of 1791, the second article of which reads as follows: "The aim of every political association is the preservation of the natural and imprescriptible rights of man. These rights are liberty, property, security and resistence to oppression."

[2] Appellant cites the statement in Williston on Contracts, Revised Ed. p. 5431, footnote 14, that: "Our courts accept the actual power of a foreign government to terminate contracts and annihilate titles within its own jurisdiction in spite of its non-recognition by the United States."

In the same footnote Williston also says: "And, irrespective of its recognition, a foreign government's decrees may be ignored as to contracts and property within our territory if they offend our own public policy."

own territory. However, the *extraterritorial effect* of such acts and of the decrees of the courts of such a nation affecting private rights is a matter which other independent nations and their courts can determine for themselves. Even if American courts decide to recognize such a decree as the one now before us, its vicious and barbarous character entitles it to no liberality of construction; it will be construed strictly.

In *Nesbitt v. Clark et al.,* 272 Pa. 161, 116 A. 404, where this court was called upon to construe a statute of the State of Colorado which provided that if a corporation shall fail to file an annual report in the State within a specified time the directors and officers shall be liable for all debts of the company contracted during the preceding year, we held that it was "a harsh and severe law", and that when we were asked to enforce a claim under it against citizens of our own state we would construe it "with great strictness".

We hold that the decree here invoked by the defendant is not to be so construed as to defeat plaintiff's claim, for under its plain terms the decree does not apply to the rights vested in the plaintiff before the decree's promulgation.

This court held in *Retirement Board v. McGovern et al.,* 316 Pa. 161, 169, 174 A. 400, as follows: "Until an employee has earned his retirement pay, or until the time arrives when he may retire, his retirement pay is but an inchoate right; but when the conditions are satisfied, at that time retirement pay becomes a vested right of which the person entitled thereto cannot be deprived: it has ripened into a full contractual obligation. See *Lynch v. U. S.,* 292 U. S. 571."

The second law pleaded by the defendant, namely, the Foreign Exchange Control Law, which became effective in Austria about December 16, 1938, VMAG contends, made it impossible to perform this contract. Appellant concedes "that a creditor to whom a debt is owed but to whom the debt is not paid at the place where it was

to be paid may enforce his right in any court which can obtain jurisdiction over the debtor, but only where such creditor has an enforceable cause of action by the law of the place where the obligation was to be performed." Having found that the Goering decree has not extinguished the plaintiff's cause of action and that it is enforceable it is admittedly enforceable anywhere. To its enforcement here in Pennsylvania, the appellant pleads that the provisions of this law prohibits it, an "inlander" from making any payments to a "foreigner" without first obtaining a governmental permit, which it has been unable to obtain, and that therefore, it is excused in any action from performance of its obligation anywhere. Without entering into any discussion as to whether this law does not limit payments to a foreigner solely "within the 'inland' ", namely, Austria, and does not prohibit payments outside of Austria, it cannot be given effect here. "The courts have held that if the statute is one of a foreign government, nonperformance of the contract will not be excused on the ground that performance thereby became unlawful or impossible." 12 Am. Jur. 379. The appellant also says that at the place of performance it would be impossible to perform and that no recovery could be had by the plaintiff. It contends that the place of performance here is Austria and Austria alone. To support this theory it contends that the action is an action on the contract. The cause of action, whether on the account stated or upon the contract with VMAG, is a case of a debt and ". . . there are numerous assertions in the cases that in the case of a debt, the place of payment is presumably the residence or place of business of the creditor even though it be out of the jurisdiction where the contract was made; . . ." 2 Beale-Conflict of Laws (1935) 1260. If, therefore, the place of performance in this case is the residence of the creditor at London, the law of Great Britain and not that of Austria is controlling. The law of Great Britain has laid down no such proscriptions as those

invoked by defendant and the latter has pleaded no impossibility of performance under its laws. See *Central Hanover Bank & T. Co. v. Siemens & Halske Ct.*, 15 F. Supp. 927, affirmed on the opinion of the court below in 84 F. (2) 993, petition for writ of certiorari denied in 57 U. S. 110, 299 U. S. 585. This question has been ably discussed by Judge PATTERSON in the last cited case. There Judge PATTERSON said: "It is the law of the place of performance that controls matters relative to legality of performance, impossibility of performance, and other excuses for nonperformance" (Citing cases) . . . "The argument is made that impossibility of performance created by foreign law is coming to be recognized both here and in England as a form of impossibility in fact and consequently as a defense to an action for breach of contract. The rule has frequently been laid down that impossibility due to change in foreign law is no excuse for breach of contract. (Citing cases).³ As, in the case cited, "the impossibility . . . or excuse relied on here is impossibility . . . or excuse by German Law. But as the contracts . . . were to be performed here, the German Law relative to performance is of no legal significance in the courts of this country."

We also agree with the court below that "the question now before the Court is whether judgment should be entered in so far as the res here is concerned, and not whether the defendant should make payment in Germany or send any money out of Germany. The fact that a foreign defendant is prohibited from making a payment in his country by decree of the sovereign can not affect the jurisdiction of this court in relation to a garnishee and a fund both within the jurisdiction of the Court . . ."

---

³ Judge PATTERSON in the same opinion says: "Williston criticizes the rule as applied in cases where the change in foreign law has destroyed the means of performance fixed by the contract or the means of performance contemplated by the parties. Williston on Contracts, secs. 1938, 1951-1953. See, also, *Earn Line S. S. Co. v. Sutherland S. S. Co.*, 254 F. 126 (D. C. N. Y.).

We can add nothing more as to the effect of the decree of January 15, 1940, which designated persons resident in Great Britain as enemies and forbade any payment to them, than what we have already said about it in relation to the effect of the Foreign Relation Control Law. This last decree was promulgated after this suit was instituted and after the original affidavit of defense was filed. This decree relating to a contract to pay money to be performed outside of the German Reich "is of no legal significance in the courts of this country." There is no impossibility or excuse for its nonperformance. The debt was and is a valid obligation of this defendant and its payment cannot be evaded by the invoking of a mere fictional "impossibility of performance". We recognize in this record no impossibility of performance *in fact,* and therefore

The judgment is affirmed. Before any action is taken on this judgment, notice shall be given to the Federal Alien Property Custodian.