183 N.J. Super. 69 (1982)
443 A.2d 244
MARIE DI PIETRO, PLAINTIFF,
v.
ANTHONY DI PIETRO, DEFENDANT.
Superior Court of New Jersey, Chancery Division Camden County.
Decided January 5, 1982.
*71 Edwin Segal for plaintiff.
Gary L. Borger for defendant.
DAVIS, J.S.C.
This divorce action presents the question of the appropriate method for calculating the present value of a pension or profit-sharing plan which is a part of the marital estate. The wife urges application of the "total offset method." This method is based upon the economic assumption that over the long run the *72 rate of inflation runs parallel with and equals the rate of interest and thereby precludes the necessity of discounting to arrive at present value. There is no reported New Jersey decision which deals precisely with this question as it relates to pension or profit-sharing plans or cases involving general damages and their present value. For the reasons hereafter stated, I conclude that this method has been shown to be economically realistic and beneficial and therefore applicable in this type of case.
Wife and husband, now age 51 and 57 respectively, were married on October 2, 1948 and lived together until final separation which took place on September 26, 1979. The wife, Marie Di Pietro, sued for separate maintenance and the husband, Anthony Di Pietro, counterclaimed for divorce. There are six children of this marriage, only one of whom is a minor, who presently resides with wife. During the course of this 31-year marriage the husband was the sole income earner and the wife was the homemaker. He presently earns a net annual disposable income of approximately $17,500 and she has no employable skills and no income. She presently receives public assistance.
The only assets legally or beneficially acquired during the marriage are the marital home, a motor vehicle, household furniture and the husband's noncontributory pension plan. The parties stipulated the value, method and ratio of distribution of all items except the pension plan. It was also stipulated that the entire value of the plan, as determined by this court, is includable in the marital estate. This court is to determine the extent of the wife's participation.

I
The issue of whether the "total offset method" should be adopted when considering the value of a pension or profit-sharing plan emanated from divergent viewpoints between two actuaries. The parties accepted both actuaries as experts after appropriate voir dire.
*73 The facts utilized by each expert were not in substantial dispute. They both utilized in their computation a male age 57, employed by Cement Masons Local Union No. 699, which had a qualified, noncontributory pension plan. Husband has been a pension plan member since August 21, 1956 and has accumulated 24.66 years of service as of June 30, 1981. His total work hours after May 1, 1970 to August 3, 1981 was 19,500. The plan entitled husband to benefits of: (a) $15 a month for each year of service up to 25 years; (b) $5.50 a month for each year of service without a maximum, and (c) $.0075 for each hour of service after May 1, 1970. The contracted entitlements multiplied by the accumulated services mentioned above provide a monthly benefit of $652 to commence at age 65. Although wife's expert erred by not including entitlement (b), the computation is necessarily as follows:

 (a) $15 x 24.66 or $369.90
 (b) $5.50 x 24.66 or $135.63
 (c) $.0075 x 19,500 or $146.25
 _______
 $651.78
 =======

At this point the experts disagree. The issue simply restated is: What is the present value of this retirement contract as described?
Husband's expert stated that since the values are being determined as of today, we must similarly look to husband's status in relationship to the plan, as of today. The plan has a provision which requires a penalty of 1/2% for each month that a participant retires before age 65. In the case at bar it is undisputed that if husband were to elect to retire as of June 2, 1981, there would exist 96 months before his 65th birthday. There would accordingly be a 48% penalty in the amount of $314 applied to the normal retirement benefit of $652, thereby leaving an early retirement benefit of $338.
Husband's expert makes an assertion that, to arrive at the present value of this $338 benefit for life, commencing now, one must only resolve the cost in the marketplace to purchase an annuity that would provide such a benefit.
*74 A more familiar expression of the same principle is: What investment, at what rate of interest, is necessary today to produce a monthly benefit of $338, payable immediately. Husband's expert states that it would take $31,079. His assumed interest rate was 10.2%. He further stated, but did not explain, that mortality tables are irrelevant.
Wife's expert first states that for actuarial purposes, the penalty assessed in husband's computation is inappropriate for the purposes of determining present value. His reasoning rests upon the required premise of "actuarial equivalence." Employee Retirement Income Security Act, 29 U.S.C.A. § 1001 et seq. (ERISA). ERISA requires that a participant can not increase or decrease the value of a plan by the exercise of one retirement option over another. Therefore, the $338 annuity must be an actuarial equivalent to the $652 annuity. As an example, if you retire early, the reduced amount will be received for a longer period of time, and that total benefit must be equivalent to receiving a larger sum for the shorter period of time. In effect, the value of the plan has not changed. Husband's expert did not dispute this representation.
Having established that the rule of actuarial equivalents prevents the imposition of a penalty for valuation purposes, wife's expert addressed the issue of the use of mortality tables. Suffice to say, pensions and annuities should be valued on the basis of the 1978 United States Life Tables of the Department of Health and Human Services, published February 24, 1978. Pressler, Current N.J. Court Rules, Appendix I (1981). Utilizing this table, the husband's life expectancy is 11.3 years after age 65.
To determine the value of the plan, wife's expert states that this court need only multiply the life expectancy in terms of months (135.6) by the calculated normal retirement benefit of $652 rounded off, the result being $88,400. It should be noted that the aforementioned mortality tables use an interest factor of 5 1/2%. Wife's expert, however, asserts that the interest factor *75 is irrelevant, which gives rise to the central issue of this case. He also states that the use of the 5 1/2% rate or any other is superfluous.
When discounting, the interest factor becomes a multiplier, but this approach does not take into account an equally competing factor, viz, the inflation factor. This latter factor becomes a divider. If we are to take into account inflation, then the interest factor is nullified because the rate of inflation, when speaking in terms of average tendencies and economic history, always closely equals the rate of interest. Therefore, since both factors are equal, they neutralize each other and the value will remain the same. There is, in effect, a "total offset."
The impact of this theory upon the valuation of plans for divorce purposes is clearly presented by comparing the traditional method of discounting, which produced a value of $31,079, with the total offset method which, as shown above, produced a value of $88,400.
Fundamentally, equitable distribution is awarded for recognized contributions that each spouse has made toward the accumulation of property during the time span of the viable coverture. Mendell v. Mendell, 162 N.J. Super. 469, 476 (App. Div. 1978). Additionally, its purpose is to relieve the strain of total reliance on support payments for financial security. Lepis v. Lepis, 83 N.J. 139, 154 (1980). If we are to fully comply with these goals, then it is incumbent upon the court to assure itself that the substance of its judgment comports favorably with existing economic reality.
Our courts have traditionally been in the forefront of making certain that our judgments comport favorably with sound economic theories. Inflation as a factor to be considered when granting awards was clearly recognized in Tenore v. Nu Car Carriers, Inc., 67 N.J. 466, 482 (1975). Although that case involved an award in a wrongful death action, there is no reasonable basis for the exclusion of its rationale from matrimonial cases where monetary awards are being considered.
*76 In all fairness, it should be stated that there are some cases in foreign jurisdictions that have adopted a middle-of-the-road theory. Feldman v. Allegheny Airlines, Inc., 382 F. Supp. 1271 (D.Conn. 1974), aff'd 524 F.2d 384 (2 Cir.1975). According to this theory the court should estimate an inflation rate that would presumably carry forward to future years, subtract this estimated rate from the discount rate and then compute present value in the traditional way. This method has been termed the "offset present value method." Exactitude is a virtue, the benefit of which may be easily lost by an excessive amount of time and expense utilized in trying to accomplish it. This negative feature was evident in Feldman, supra,[1] and discussed ably in "Future Inflation, Prospective Damages and the Circuit Courts", 63 Va.L.Rev. 105, 123 (1977).
Wife's expert avoids guessing at what the inflation and discount rates will be for each of the next 16 years when husband reaches age 65. Based upon what this court concludes to be ample authority,[2] Goodfarb has demonstrated that the "total offset method" is much simpler, equally sound and most assuredly a less expensive way of computing the present value of an award.
*77 He recognized that, in each year as time passes by, there may be a difference between the two; however, he relies upon what this court finds to be ample authority that the two nearly always equal over the long run. Not only from an historical and economic viewpoint is this theory supportable, it is not too dissimilar to the doctrine espoused by Emerson[3] when he said, "the voyage of the best ship is a zigzag line of a hundred tacks. See the line from a sufficient distance, and it straightens itself to the average tendency."
Finally, and perhaps most importantly, there is judicial authority for the "total offset method." Our sister state, Pennsylvania, in a personal injury action, adopted this theory and in the process utilized Tenore v. Nu Car, supra, for assistance in arriving at its conclusion. Kaczkowski v. Bolubasz, 491 Pa. 561, 421 A.2d 1027 (Sup.Ct. 1980). Additionally, Alaska has adopted this theory. Beaulieu v. Elliot, 434 P.2d 665 (Sup.Ct.Alaska 1967); State v. Guinn, 555 P.2d 530 (Sup.Ct.Alaska 1976). Also see Freeport Sulphur Co. v. S.S. Hermusa, 526 F.2d 300, 310 (5 Cir.1976) (concurring opinion).
An extra 6% was suggested by Goodfarb as an addition to the amount already arrived at by the court, but this has been rejected because Goodfarb did not adequately support how that percentage had been determined. Accordingly, I find the marital estate to consist of the following assets:

 Pension plan $ 88,400
 Marital home 48,000
 Furniture and Fixtures 500
 Automobile 4,000
 ________
 $140,900

II
As previously stated the parties have already agreed that the marital home should be sold and the net proceeds divided equally between them. It is the judgment of this court that this home shall be listed for immediate sale, with both parties *78 executing the listing agreement. There shall be no charge against the husband for use of the premises since, by this judgment, it is his responsibility to pay the mortgage until the time of sale. Nor shall he receive credit for mortgage reductions. The wife shall receive a credit as per the parties' stipulation, amounting to one-half of the value of the car and household furnishings. This credit totals $2,500.
The pension plan of which the husband has always been a member during his marriage does not require him to contribute any part of this income. Accordingly, the wife has not been deprived of any monies by way of payroll deductions, as is the case in contributory plans. This fact is important in determining the extent to which wife should participate in the value of this plan. Clearly, there was no effort or sacrifice on her part that created this fund. As a matter of fact, and I so find, the wife did not contribute a great deal of emotional strength to this union. Therefore, it is my opinion that a fair and equitable share in this fund is 25% or $22,100.
This marital estate is not sufficiently endowed whereby total distribution can immediately be made; therefore the wife's enjoyment of her distributive share shall be postponed until the enjoyment of the same devolves upon the husband at age 65 or earlier, if he elects. A split beneficiary arrangement should be established as of May 20, 1981, the date of filing of the divorce, so that the wife will not participate in any future increments of benefit. Counsel is to provide this court with such an arrangement, presumably worked out between the two actuaries, within ten days of this judgment.

III
Based upon the lack of skills of the wife and her inability to acquire meaningful employment, the husband shall pay her the sum of $75 a week as alimony until he retires, at which time it shall cease, and $40 a week as child support, which shall terminate when the unemancipated child reaches the age *79 of 18. If the child enrolls and participates in any post-high school educational programs on a full-time basis, then said payments shall continue until the course is properly and timely completed. The husband shall be responsible for all medical expenses of the dependent child. In addition, he shall be responsible for $3,000 of the wife's counsel fees, the same to be paid from his share of the proceeds at the time the home is sold.
NOTES
[1] The appellate court summarized the district court's process as follows:

In calculating the discount rate, the appellee's expert, relied on by the district court, used an average earnings of 4.14% (from mutual savings bank investments) as representative of a prudent, non-sophisticated investment and subtracted 2.87% as the average yearly inflation rate revealed in the Department of Labor's Consumer Price Index over an 18-year period, yielding a 1.27% difference which was rounded up to 1.5%. Judge Blumenfeld corroborated this "inflation-adjusted discount rate" of 1.5% by calculating the real yields of investments since 1940 in federal government securities (with inflation factored out) from the 1974 Economic Report of the President, a source referred to by appellant Allegheny's expert.
[2] "Inflation: A Survey", 85 The Ec. J. 741, 783 (1975). Gibson, "Interest Rates and Inflationary Expectations: New Evidence," 62 Amer.Ec.Rev. 854 (1972). Friedman and Schwartz, A Monetary History of the U.S., 1867 to 1960 (1963).
[3] Emerson, Essays, "Self-Reliance," 60 (1883).