## Kalinoski v. Kalinoski

*Douglas E. Weinrich,* for plaintiff.
*Lee A. Montgomery,* for defendant.

BRYDON, *J.,* June 29, 1983 — The court is presented with the question of whether "nonvested" pension benefits are subject to equitable distribution under our new Divorce Code, Act of April 2, 1980, P.L. 63, §401, 23 P.S. §401 (hereinafter, e.g., "§401"). As with most issues under new statutes, this case involves new law; the court has no Pennsylvania appellate court guidance. Because there are conflicting cases among the counties' courts, compare Paul W. v. Margaret W., 130 P.L.J. 6 (1981) (equal division is starting point for consideration) with Ruth v. Ruth, 67 Lanc. 461 (1981) (equal split not a presumptive starting point), other court of common pleas' opinions are not always helpful as precedents. The court respectfully disagrees with Kutzer v. Kutzer, 110 Montg. 226

(1982), believing that an analysis of the Pennsylvania Divorce Code, the legal literature on the subject, and the law in other states compels a holding that nonvested pensions are marital property which may be valued, so as to be currently subject to equitable distribution.

Pennsylvania is an older, industrial state with a deteriorating economic base. As times get tougher we may reasonably expect divorces between people who are financially strapped, even if still employed. In many cases the parties will have only two major assets — the marital home and the pension rights of one or both employee spouses — and the pension may in fact be the larger of the two. See Dickinson, Role of Retirement Plans, 10 Real Prop., Prob. & Tr. J. 644 (1975). The courts are obligated to confront what will be recurring problems concerning equitable distribution of pensions, despite the bewildering complexity and formidable jargon associated with the area. The bar must recognize that the complexity of the area may not protect an attorney from a malpractice judgment. See Smith v. Lewis, 530 P.2d 589, 78 A.L.R. 3d 231 (Cal. 1975) ($100,000 verdict for failure to include present value of pension in property settlement agreement).

There are two general types of retirement plans, the "defined contribution" plan and the "defined benefit" plan. Defined contribution plans include profit-sharing plans, stock bonus plans, money-purchase plans, and target benefit plans, among others. A defined contribution plan does not promise the employee a specific amount of monthly benefit payable upon retirement. It is more like an individual tax-sheltered savings account for each employee, only the employer makes the deposits (called "contributions") and the "interest" on the account fluctuates with the market value of its in-

vestments. Defined benefit plans are more what the average worker thinks of as a "pension", and that term will be used in this opinion, even if imprecise. In defined benefit plans, the employee will receive a fixed amount per month upon retirement for the rest of his life. It is, in other words, an annuity. Unlike in defined contribution plans, the plan trustees are not required to keep individual accounts for each employee. All we know is that if the employee stays on the job until retirement, he gets his pension. When the pension plan begins making payments, the benefits are said to have "matured". Although some plans provide otherwise, generally the employee is not entitled to a pension beginning on the first day of the job. Rather, he must put in a certain amount of time before reaching the threshold requirements of eligibility. Once he reaches the eligibility standard, his rights are said to have "vested". See generally, Hardie, Pay Now Or Later, 53 Cal.S.B.J. 106 (1978).

Nationally, the lead case concerning nonvested pensions in the context of divorce is In re Marriage of Brown, 544 P.2d 561, 94 A.L.R.3d 164 (Cal. 1976). This case reversed an older ruling by the California Supreme Court which held that nonvested pension rights were not property but an expectancy, and therefore not community property. French v. French, 112 P.2d 235, 134 A.L.R. 366 (Cal. 1941). Looking to the reasoning of California and other community property states may be helpful because of their experience in dividing property.[1] Deering v.

---

1. A majority of community property states do not mandate equal division of community property. Texas may be particularly helpful because its community property statute permits an unequal division of property with language similar to our own statute. See, e.g., Jackson v. Jackson, 552 S.W.2d 630 (Tex.Civ.App.1977), compare V.T.C.A., Family Code, sec.

Deering, 437 A.2d 883, 887 n. 6 (Md. 1981). However, equitable distribution must be analyzed on the basis of its own framework. This is because marital property is not community property. The latter has been held to be unconstitutional under Pennsylvania law. Willcox v. Penn Mutual Life Ins. Co., 357 Pa. 581, 55 A.2d 521, 174 A.L.R. 220 (1947). This distinction will be discussed later, but in the meantime a survey of other equitable distribution states discloses the following positions on nonvested pensions in divorce:

Several states' courts have definitively held that nonvested pensions are equitably distributable, including Wisconsin, Bloomer v. Bloomer, 267 N.W.2d 235 (Wis. 1978); Delaware, Robert C.S. v. Barbara J.S., 434 A.2d 383 (Del. 1981); Maryland Deering, supra; and Connecticut, Thompson v. Thompson, 438 A.2d 839 (Conn. 1981). Virginia, by statute, expressly provides for the equitable distribution of "the present value of pension or retirement benefits, whether vested or nonvested", Va.Code sec. 20-107.3(E)(8), as does Nebraska, Neb.Rev.Stat. sec. 42-366(8). Minnesota's equitable distribution statute includes "vested pension benefits or rights" in its definition of marital property, Minn.Stat. sec. 518.54 subd. 5, but this has been extended to nonvested pensions by the courts, Freed and Foster, Family Law in the Fifty States, 8 F.L.R. 4065, 4097 (1982). Contrary holdings have been delivered by the courts of Michigan, Miller v. Miller, 269 N.W.2d 264 (Mich.App. 1978); Indiana,

---

3.63 ("the court shall order a division of the estate of the parties in a manner that the court deems just and right) with 23 P.S. sec. 401(d) ("the court shall . . . equitably divide, distribute or assign the marital property . . . in such proportions as the court deems just").

Savage v. Savage, 374 N.E.2d 536 (Ind.App. 1978); Missouri, In re Marriage of Faulkner, 582 S.W.2d 292 (Mo.App. 1979); and Kentucky, Ratcliff v. Ratcliff, (Ky. 1979).

The New Jersey experience is instructive. In Mueller v. Mueller, 400 A.2d 136 (N.J. Super.Ch. 1979) the Chancery Division (Matrimonial) held that a fully vested but unmatured pension was not equitably distributable, based on future interest principles. This result was criticized in a later case which aptly summed up the problem:

"Many decisions addressing the law of equitable distribution as it relates to pensions have seized upon the concept of 'vesting' as a primary criteria [sic] in determining whether the plan should be subject to distribution. The late Chief Justice Weintraub said in another context: 'The companies stress the statement found in some cases that a utility's interest in the public easement is a 'vested right.' Such labels may conceal as much as they reveal. . . ." Weir v. Weir, 413 A.2d 638, 639 (N.J. Super.Ch. 1980) (Emphasis in original).

The pension issue, at least as regards vested pensions, should be settled by Kikkert v. Kikkert, 427 A.2d 76 (N.J. Super. App. 1981), which adopted the reasoning of Weir. At least one commentator has suggested that Pennsylvania should follow New Jersey case law. Editor's Comment, 2 Pa.Fam.Law. 220 (1981).

However, even if the equitable distribution of vested pensions is not open to question, what about nonvested pensions? "Marital property" is defined as being all property acquired by either spouse during marriage, with certain exceptions not relevant here. Sec. 401(e). See also Painter v. Painter, 320 A.2d 484, 495 (1974). Section 401(f) adds the words "whether real or personal". And, although the words

"all property, real or personal" have always been given a broadly comprehensive construction, County of Erie v. Commissioners of Water-Works, 113 Pa. 368, 6 A. 138 (1886), the problem remains of how to construe the word "property" itself in the context of equitable distribution.

"Property" means "one or more interests either legal or equitable, possessory or non-possessory, present or future, in land, or in things other than land, including choses in action. . . ." Uniform Property Act sec. 1(a) (act withdrawn 1966). The purpose of the Act was to abolish anachronisms in the law of property and to abolish many out-of-date characteristics which may have come down from the early feudal law of England, but which are out of place in modern law. Ellingrod v. Trombla, 95 N.W.2d 635 (Neb. 1959). Chief among those out-of-date characteristics is the concept of vesting. Prior to Mueller, the Supreme Court of New Jersey, in dicta, spoke on the subject:

"[T]he concept of vesting should probably find no significant place in the developing law of equitable distribution. The notion of a vested interest came into being in a feudal society and was intimately associated with the medieval concept of seisin. . . . It has played an important part in the law of future interests, and early assumed a crucial role in the portion of that law dealing with the rule against perpetuities. On the other hand and in a quite different context the phrase, 'vested rights', is occasionally used to denote something to which constitutional guarantees may apply. . . . These now customary usages of the concept of vesting are clearly in no way relevant to the question of effecting an equitable distribution upon the occasion of a divorce. Our statute requires, in order that property be available for distribution incident to a divorce, that it shall

have been acquired during marriage. There is no reference to vesting. . . ." Stern v. Stern, 331 A.2d 257, 262 (N.J. 1975) (citations omitted) (Emphasis in original).

Unlike community property, under equitable distribution "[i]t is important to bear in mind that nothing . . . effects any change with respect to the ownership of the property as between husband and wife prior to the entry of a judgment of allocation. Prior to that event neither spouse . . . acquires any interest in the property of the other." Painter, supra, 320 A.2d at 494 n. 5. But even though while married one spouse has no present interest in the property of the other, because equitable distribution applies to marital property "acquired during marriage", and even applies to marital property acquired before the effective date of the Divorce Code, under Bacchetta v. Bacchetta, 498 Pa. 227, 445 A.2d 1194 (1982), marital property is a "species of common ownership" which becomes a present interest in the future possession of the pension rights upon the filing of the divorce action. See Collins v. Oklahoma Tax Commission, 446 P.2d 290 (Okla. 1968) (as explained in Imel v. United States, 523 F.2d 853 (10th Cir. 1975)).

Applying Pennsylvania law, the court finds that pension benefits are marital property, whether or not they are "vested". The Divorce code makes reference to various factors in connection with equitable distribution of marital property, including "[t]he sources of income of both parties, including . . . retirement . . . benefits. . . ," sec. 401(d)(6), and "[t]he opportunity of each party for future acquisitions of . . . income," sec. 401(d)(5). A pension is not an unrequited payment by a beneficent employer in thanks for a job well done. It is a contract for compensation for services already rendered, and

amounts to an inchoate debt of that compensation. David v. Veitshcer Magnesitwerke Actien Gessellschaft, 348 Pa. 335, 35 A.2d 346 (1944), Hardy v. H.K. Porter Co., 417 F.Supp. 1175 (E.D.Pa. 1976). The pension "matures" and becomes payable (i.e., choate) upon various conditions, at which time the employee would have an enforceable action for the debt. Debts are choses in action, Smith v. Glen Alden Coal Co., 347 Pa. 290, 32 A.2d 227 (1943), which are personal property, presumed to be martial property under section 401(f).

Thus, the word "vested" in the pension context is misleading. Some pensions entail an employee's contributing his own money for his pension, usually by payroll deductions (i.e., a "contributory" plan). An employee's right to accrued benefits attributable to his own contributions cannot be forfeitable in any case, and are in that sense "vested". 29 U.S.C. §1053(a) (1). More generally, a "noncontributory" pension right is "vested" when the employee's right to receive future payments will remain even if he quits or is fired. 29 U.S.C. 1002(19) & 1053(a) (3) (A). But, "vested" rights attributable to the employer's contributions can be forfeited or suspended upon the employee's death, 29 U.S.C. 1053(a) (3) (A), his or her reemployment after retirement, 29 U.S.C. §1053(a) (3) (B), retroactive amendments to the plan, 29 U.S.C. §§1053(a) (3) (C) & 1082(c) (8), and withdrawal of the employee's mandatory contributions, 29 U.S.C. §1053(a) (3) (D). Thus, even if a pension benefit is fully "vested", there may remain conditions to fulfill, chief among them being survival. In that the pension is not a gratuity, it is also not a mere expectancy. It is a contingent future interest in a debt. Under Pennsylvania law, contingent interests are capable of being valued, even if

expectancies are not. Robbin's Estate, 199 Pa. 500, 49 A. 233 (1901). Whether the conditions occur before or after "vesting" in a pension sense is therefore irrelevant. On the contrary, a holding that only "vested" pensions are equitably distributable would be against the legislative intent of the Divorce Code, which is to "[m]ake the law for legal dissolution of marriage effective for dealing with the realities of matrimonial experience," § 102(a) (1). For example, let us suppose that an employee spouse had been employed for eight years with a company that uses ten-year 100 percent "cliff" vesting. 29 U.S.C. § 1053(a) (2) (A). If unvested pensions are not equitably distributable, the spouses could hate each other, have no children, and generally be entitled to a divorce, but the non-employee spouse had better stay married at all costs for another two years, until the other's pension "vests". See Kuchta v. Kuchta, 7 F.L.R. 2701, 2702 (Mo. 1981) (dissenting opinion), rev'd and withdrawn on reconsideration, 636 S.W.2d 663 (Mo. 1982).

The four states which held nonvested pensions not equitably distributable did so on the theory that the valuation of non-vested pensions is too "speculative". This objection is true, but is also a non sequitur. We use speculation in all phases of the law. We speculate about the fair market value of a decedent's estate, even though there was no sale and there may not even be a market. We speculate about the dollar value of "good will" of an ongoing or defunct business. We speculate about a person's life expectancy in wrongful death cases, and we speculate about what his or her earnings might have been. We even speculate about the extent and severity of pain and suffering, and we put a dollar value on it. In any event, speculating about value does

not mean nonvested pensions are not marital property. Compare Kutzer:

"There remains the question of equitable distribution. The only assets involved are the pensions. Again, the subject is not free of difficulty.

"Section 401(e)(4) of the Code excludes from marital property all property acquired by a party after separation. Thus, when considering pensions, accretions to a pension plan after the date of separation are presumably not marital property. This suggests that unless the plan has vested, it is not capable of valuation.

". . .

"The two pensions undoubtedly had some value in 1978, even if not vested and the value simply consisted of contributions. However, no evidence was presented as to that value, and that alone would prevent equitable distribution of the assets. . . ." Kutzer, supra at 234-35 (Emphasis added).

Of course, the employee's contributions are always fully vested. As will be explained below, there are established sound actuarial methods for valuing nonvested pensions. Perhaps the issue is clearer if one considers a couple who divorce one day before the pension vests. Should the value remain at zero? On the contrary, equitable considerations mandate equitable distribution to effect economic justice between the spouses. Section 102(a)(6). The employee has bargained for a pension. The employer must make actuarily based contributions into the plan to cover the future payments, whether or not they have vested. See Exhibit IV [deleted]. This is a form of compensation, and is presumably in lieu of higher wages. The pension rights are therefore an "economic resource acquired with the fruits of the wage earner spouse's labors which would otherwise have been utilized by the parties during the marriage to

purchase other deferred income assets." Deering, supra, 437 A.2d at 888.

Having found that nonvested contributory pension rights are equitably distributable, the court must next deal with the mechanics of distribution. There are really only two choices: (1) retain jurisdiction and divide the pension benefits if, as, and when paid; or (2) assign a persent value to the contingent annuity, award the pension to the employee spouse, and award other marital property (or a note) of offsetting value to the nonemployee spouse.

Actuarial science is based on probability. No single calculation will be correct because nobody knows the future. No doubt many employee spouses will therefore prefer the reservation of jurisdiction, wait and see approach because both parties share the risks of the potential pensioner's dying or being fired. The view of the employee spouse may be that actuarial present values are just judicial sleight of hand which awards "real" assets, e.g., equity in a home, to the other side, while the award of future money may in fact never be paid. Cf. Ledbetter v. Ledbetter, 547 S.W.2d 214 (Mo.App. 1977) (patently inequitable to award all liquid assets to one spouse). Also, the pension may be taxed as an annuity, 26 U.S.C. sec. 402(a)(1), in part at ordinary income rates, 26 U.S.C. sec. 72, while the nonemployee spouse's "equivalent" asset, e.g., a home, may be taxed at capital gain rates, 26 U.S.C. §1221 & 1202(a), or not at all, 26 U.S.C. §121.

The first objection was discussed earlier. The fact that actuarial present values are based on reasonable speculation does not invalidate them, and one side in a lawsuit always ends up feeling unfairly treated. The objection regarding ultimate taxation is beside the point. Tax consequences are not listed as a factor in Section 401(d), as compared to, for exam-

ple, Wisconsin's equitable distribution statute, Wis.Stat. §767.255(10). The court is "reluctant to consider the theoretical tax consequences of a sale which is neither necessary nor probable but purely conjectural." Wahl v. Wahl, 159 N.W.2d 651 (Wis. 1968). The same is true of the pension. The employee spouse may elect a lump sum distribution of benefits, 26 U.S.C. §402(e)(4)(A) & (B), and may in turn elect the favorable special 10-year averaging, 26 U.S.C. §402(e)(1)(B). He or she may remarry, in which case the employee spouse may elect to provide a 50 percent joint/survivor benefit to the new spouse in the event of death prior to retirement. 26 U.S.C. §401(a)(11)(E). All of these elections are within the employee spouse's control, who could argue one method of taxation in order to reduce the present value of his or her pension, changing things after the equitable distribution is final. Contra, Selchert v. Selchert, 280 N.W.2d 293 (Wis. 1979). Finally, under Bacchetta, supra, and Imel, supra, a pro rata division of marital property should avoid tax problems under United States v. Davis, 370 U.S. 65 (1962). If, on the other hand, retirement or the sale of the home were imminent, or if the division of marital property incident to the divorce were non pro rata, the elections and figures would be at hand and it would "not be improper for a judge to give appropriate heed to legitimate tax considerations." Painter, supra, 320 A.2d at 493. See generally, Mahoney, Koritzinsky & Olson, Tax Strategies in Divorce 106-137 (1981) and Pennsylvania Bar Institute, 19th Annual Tax School (1980). So, despite the probable objections of the employee spouse, where retirement is many years away, the distribution of present value approach is preferred:

"Where the court is satisfied, based upon appropriate proofs, that present value has been estab-

lished and there are other assets to be distributed, a firm and final division may be achieved free of future contingencies. Where, as here, ultimate enjoyment of pension benefits depends upon survival of the employee, present value considerations must include actuarial computations based upon life expectancy tables. . . . Although fixing present value under such circumstances may be difficult and inexact, nevertheless immediate final resolution of the method of distribution is to be encouraged, preferably by voluntary agreement whenever possible. Long-term and deferred sharing of financial interests are obviously too susceptible to continued strife and hostility, circumstances which our courts traditionally strive to avoid to the greatest extent possible. This goal may be best accomplished, if a present value of the pension plan is ascertainable, by fixing the other spouse's share thereof, as adjusted for all appropriate considerations, including the length of time the pensioner must survive to enjoy its benefits, to be satisfied out of other assets, leaving all pension benefits to the employee himself." Kikkert, supra, 427 A.2d at 79-80.

Current distribution is further recommended because of the legal and practical problems associated with the reservation of jurisdiction approach. See generally, Hardie & Sutcliffe, Reserving Jurisdiction: A Potential Trap, 2 Cal.Law., July/August 1982 at 33. The legal problems twirl around uncertainties of enforcement under the Employee Retirement Income Security Act of 1974, Pub.L. No. 93-406, 88 Stat. 829 (1974) (cited in titles 26 and 29 of the United States Code). This federal statute preempts all state laws as they relate to any pension. 29 U.S.C. §1144. The legislative history states, "This principle is intended to apply in its broadest sense to all actions of State or local governments, or any in-

strumentality thereof, which have the force or effect of law." 120 Cong.Rec. 29933 (1974). ERISA unequivocally provides that pension benefits "may not be assigned or alienated." 29 U.S.C. §1056(d)(1), 26 U.S.C. §401(a)(13). The plain meaning of the statute would include assignments pursuant to equitable distribution of marital property. General Motors Corp. v. Townsend, 468 F.Supp. 466 (E.D.Mich. 1976) but many courts have held that the words don't mean what they say, e.g., Stone v. Stone, 450 F.Supp. 919 (N.D.Cal. 1978), aff'd 632 F.2d 740 (9th Cir. 1980), cert. den. 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981) (community property). The court is reluctant to rely on cases such as Commonwealth ex rel. Magrini v. Magrini, 263 Pa. Super. 366, 398 A.2d 179 (1979) for a judicial posture which must extend until a retirement decades in the future, believing that only Congressional action can settle the issue. For example, many cases had held military retirement pay to be community property, Bass, Update: Division at Divorce of ERISA and Other Benefit Plans, 6 F.L.R. 4001, 4001-03 (1979), but the Supreme Court of the United States reversed all of them, McCarty v. McCarty, 453 U.S. 210 (1981). McCarty was the law until Congress amended the statute. Uniformed Services Former Spouses' Protection Act, Pub. L. 97-252, §1001, 96 Stat. 718, 730 (1982), 10 U.S.C. §1408. Similarly, federal civil service retirement benefits, which are not covered by ERISA, 29 U.S.C. §1003(b)(1), had an anti-alienation provision, 5 U.S.C. §8345. It was amended in 1978 to permit assignment of benefits in connection with divorce. Pub.L. 95-366, 92 Stat. 600 (1978). Similar amendments have· been proposed for ERISA, ERISA Improvements Act of 1979, S.B. 209, 96th Cong., 1st. Sess. (1979) and H.R. 1884, 96th Cong.,

1st Sess. (1979), but have not passed. The obvious inference is that Congressional action is needed in order to permit the assignment of ERISA pension benefits, cases to the contrary notwithstanding. Contra, Reppy, Community and Separate Interests in Pensions and Social Security Benefits After Marriage of Brown and ERISA, 25 U.C.L.A. L.Rev. 515 (1978). See generally, Troyan, Pensions and Equitable Distribution, 1 E.D.R. May, 1981 at 13.

A corollary legal problem involves joinder. Joinder of the plan trustee or administrator would be necessary when a court reserves jurisdiction. Without making the pension plan a party to the proceeding, the court would have no jurisdiction to order the plan to make the payments to the non-employee spouse. But, joinder is a time-consuming legal device. It requires the preparation, filing, and service of the complaint, and listening to all the arguments raised by the plan's lawyers, as discussed above. Additional motions or problems concerning the law as it develops may increase the legal fees consumed in the process. The situation should be avoided.

Practical problems associated with the reservation of jurisdiction abound. "Keeping track of everything that happens to an employee from the time he is employed until the last retirement check is paid is quite a chore. Few companies have developed sophisticated data base systems for pension plans, and even fewer have the capability to store and retrieve information about the marital status of employees and prior claims against an employee's pension benefits. . . . It is naive to assume that several years later the plan administrator will have any information regarding the divorce, let along information regarding the final disposition of the pension." Hardie & Sutcliff, supra at 35. Furthermore, the non-employee spouse's lawyer may die, retire, or leave

his firm. His files may be lost or accidentally destroyed. The waiting spouse may simply forget about the pension rights. The employee spouse may intentionally frustrate the other's receipt of the as-yet-unpaid portion of the benefits by changing jobs, moving across the country, or retiring in a foreign land. Why should the nonemployee spouse have to initiate further legal action to secure compliance? If he or she does change jobs, even the employee spouse may forget about the pension rights. See 42 U.S.C. §1320b-1 (notification of social security claimant with respect to deferred vested benefits). Reserving jurisdiction has a beguiling appearance of simplicity which masks complicated problems. A present disposition is actually the more conservative approach.

Valuation of defined contribution plans is easy. The amount of the employee's individual account is the present value of the pension. If the defined contribution plan is a profit-sharing plan or an Individual Retirement Account, the employee spouse may be able to cash out the nonemployee spouse's marital property without adverse tax consequences. 26 U.S.C. §408(d)(5). It is the defined benefit plan which raises significant valuation questions. Some courts have held that expert testimony is always required. Robert C.S. v. Barbara J.S., supra, Heber v. Heber, 447 N.Y.S.2d 601, 112 Misc.2d 799 (N.Y.Supr. 1982). As observed earlier, many parties with pension rights may not be able to afford expert testimony. Although expert testimony is helpful and desirable, lawyers and judges can calculate actuarial present values by themselves, if only shown how. The following discussion is based on Projector, Valuation of Retirement Benefits in Marriage Dissolution, 50 L.A.B.Bull. 229 (1975) and Troyan, Valu-

ing Pensions "Total Offset Method" Is Inappropriate, 2 E.D.R. 138 (1982).

At the outset it must be pointed out that the trial court has great discretion and latitude in connection with equitable distribution. One must dispense justice in accordance with the facts. Thus, for example, if the employee spouse can show that a high probability exists that he or she will never receive any pension benefits (due to problems with the plan's solvency, or the like), the court may decline to distribute anything from the pension. Bolt v. Bolt, 317 N.W.2d 601 (Mich.App. 1982). One must also be flexible. If, as here, there is no expert testimony, precision in computation may be sacrificed, based on the lack of availability of facts and tables, in favor of lower litigation costs.

The following steps will produce the present value for a contingent annuity starting in the future:

1. Calculate the amount of monthly pension payments. Assume that the employee was at normal retirement age (usually 65) and retired with a fully vested pension on the date of separation. (Later raises in wages due to merit or inflation would not be marital property. Section 401(e)(4).)

2. Find the employee's life expectancy at the time of separation. Subtract the normal retirement age in order to determine the probable number of months of pension benefits.

3. Select a discount rate. The legal rate (6 percent in Pennsylvania, 41 P.S. §201) is clearly inappropriate, Bouchard v. Bouchard, 321 N.W.2d 330 (Wis. 1982), and would create too high a present value. Probably the best indicator of the true value of this tax-sheltered money is the effective interest on local high-grade municipal bonds.

4. Find the then-present value of the annuity at the normal retirement age.

5. Discount the then-present value to present value, accounting for mortality, disability, and termination, as appropriate for the specifics of the plan involved.

6 Reduce the present value of the pension to account for lack of vesting, if necessary. Some plans will be either zero or 100 percent vested. Others will be partly vested and partly not, in which case only the nonvested portion should be reduced.

7. If a portion of the pension was earned before marriage, it is not marital property and must be excluded. Accordingly, multiply the present value by a fraction, the numerator of which is the total time of the marriage until separation, and the denominator of which is the total time of employment (assuming the employee spouse is working at the time of separation). Jerry L.C. v. Lucille H.C., 448 A.2d 223 (Del. 1982).

We now turn to the facts of this case. The court, by letter, requested the defendant to provide complete employment records and a copy of the pension plan. There was partial compliance in that some employment data was already in the record and a summary plan description was supplied. Neither could the parties agree on a present value. The court recognizes that its calculations will be less accurate than a professional actuary's, but believes the calculation to be reasonable and not an abuse of discretion.

1. Under the defendant's pension plan, the first three months after retirement are based on vacation pay. Information about vacations was not provided, and the vacation aspects will be ignored. Exhibit I [deleted] is an example showing how to estimate pension benefits taken from the summary plan description. As it turns out, the "Percent Pension" exceeds the "Minimum Pension", so steps 1 through 5

will not be shown. The earliest wage data in the record is defendant's 1981 I.R.S. Form W-2. It shows wages of $22,542.05. This is a monthly average of $1,878.50. Defendant was 33 years old at the time of separation and would therefore have 32 years of continuous service at age 65. He would therefore be entitled to monthly payments of 1.1% times 32 years times $1,878.50, or $661.23. The court will not assume that the defendant will remarry and will therefore ignore the Reduction for Pre-Pension Spouse Coverage.

2. Exhibit II [deleted] is a readily available life expectancy table taken from the regulations to the Internal Revenue Code, 26 C.F.R. §1.72-9. At age 38 defendant had a life expectancy of 35.6 years. The court will assume that defendant's birthday was some months before separation and will round off life expectancy to 35 years, for a total life expectancy of 73 years. He may be expected to collect his pension for eight years, i.e., 96 months, after retirement at age 65. The total amount paid would be 96 times $661.23, or $63,478.08. However, because of the time value of money and because of the effect of inflation is post-separation, the "full offset" method of valuation, used in valuing lost eanings capacity in personal injury cases, Kaczkowski v. Bolubasz, 491 Pa. 561, 421 A.2d 1027 (1980), is incorrect. Contra, DiPietro v. DiPietro, 443 A.2d 244 (N.J.Super.Ch. 1982). The value of money is not static, but grows with time because of the availability of interest. For example, $1 in the hand is worth $1. But at ten percent interest $1 now would grow to $1.10 in one year. Similarly, ninety-one cents now would be worth $1 in one year. This means that at ten percent simple annual interest the present value of a $1 payment in one year is about ninety-one cents. The present value of a $1 payment two years from now is

about eighty-three cents. Continuing the calculations can yield the present value of an annuity by adding up the total amounts of the present values of all the payments.

3. Ten percent interest was used just for example. For actual valuation purposes the court will look to the "A" rated Butler County General Obligation Bonds, maturing 2003, paying eight percent per $1,000 face value, or $80 per year. These bonds were selling at $865.17. $80 is approximately 9.25 percent of $865.17, and that will be the discount rate.

4. Exhibit III [deleted] is taken from Am.Jur.2d Desk Book Item No. 128 (1979). It shows that $1 payable monthly for 96 months has a present value of $67.657991 (obviously less than the full $96 expected to be paid). If monthly pension payments are $661.23, their then-present value at age 65 will be $661.23 times 67.657991, or $44,737.49 (again, less than the full $63,478.08 expected to be paid).

5. Exhibit III also shows that the present value of $1.00 at 9.25 percent payable in 27 years (the time between separation at age 38 and retirement at age 65) is $0.083082. In other words, $0.083082, invested at 9.25 percent compounded monthly, will grow to $1.00 in 27 years. However, unlike discount tables, mortality tables change with time based on the statistical averages of the changing population. Even at any one time, there are a number of different tables available, each appropriate for a different population, e.g., white nonsmoking males. Fortunately, the annual changes and the differences among populations are not great. The court takes judicial notice of Exhibit IV [deleted], which is a scientific compilation used by actuaries to compute the probability of survival from any given age to a second given age. Only column one is needed. Take the

ratio of $1_\times$ at the second age to $1_\times$ at the current age. Here, $1_\times$ at 38 is 9,709.7433. $1_\times$ at 65 is 7,676.6819. So, the probability of surviving from age 38 to age 65 is 7,676.6819 divided by 9,709.7433, or 79.0616 percent. The present value discounted for interest and mortality is therefore $44,737.49 times .083082 times .790616 or $2,938.62.

6. "Adequate employment or turnover tables are seldom available. Too many industries, too many occupations, and too many economic cycles all combine to make the selection of the appropriate table for a given valuation subject to much uncertainty, subjectivity, and disagreement. . . . But we still need some estimate of the probability of completing service to 100 percent vesting in order to complete our valuation, even if the right table is hard to come by. There is, fortunately, another route to usable estimates, which is based on methods more instinctive than sophisticated. Consider the probability of service to 100 percent vesting as equal to the portion already completed. If ten years are required and two have already been completed, then one can estimate 20 percent as the probability of completing all ten years. . . . This is a pragmatic estimate, not based on data, but appealing in its simplicity and plausibility." Projector, supra at 236. The court's understanding is that the defendant had worked five years at the time of separation. Discounting for novesting yields 50 percent times $2,938.62, or $1,469.31. This is the present value of 96 payments of $661.23 to start 27 years in the future, appropriately discounted.

7. The entire amount was earned during marriage; it is all marital property.

## FINAL DECREE

And now, June 29, 1983, it is ordered and decreed that:

1. Plaintiff lacks sufficient property to provide for her reasonable needs, included but not limited to mortgage payments. Defendant is currently laid off from work. Pursuant to 23 P.S. §501(b), plaintiff is granted alimony of $15 a month, payable to the Domestic Relations Office of Butler County, starting from the date of this final decree, in order to help her establish herself in the employment market, subject to 23 P.S. §501(e) (changed circumstances).

2. Plaintiff is awarded possession and use of the home for five years, at which point the home shall be sold.

3. The net proceeds from the sale of the home shall be awarded equally between the parties, except adjusted as follows:

a. Plaintiff's portion shall be reduced and defendant's portion shall be increased by the sum of $200 a month, with simple interest at 11 percent, calculated from the date of this final decree, until the home is sold. This is one half of the fair rental value of the property.

b. Defendant's portion shall be reduced and plaintiff's portion shall be increased by the sum of $734.65. This is one half of the present value of the marital portion of the defendant's pension at Aetna-Standard Engineering Company, as of the date of separation. In the event that at the time the home is sold the defendant is no longer employed by Aetna Standard and does not expect to receive any value from the pension plan, this subparagraph shall be disregarded.

c. Defendant's portion shall be reduced and plaintiff's portion shall be increased by one half of

the total amount of mortgage payments attributable to principle which the plaintiff makes, calculated from the date of this final decree until the home is sold.

4. Defendant is awarded all pension rights from his own employment.