# Abbott v. Schnader Harrison Segal & Lewis LLP

C.P. Philadelphia County, June Term 2000, no. 1825.

*Alfred W. Putnam Jr.,* for plaintiffs.
*Elizabeth K. Ainslie,* for defendant.

HERRON, *J.,* February 28, 2001—This case presents the narrow issue of whether active partners may retroactively modify retirement benefits pursuant to a general amendment provision in their partnership agreement to the detriment of retired partners who had completed the requisite years of service and were receiving retirement compensation under the agreement. This issue is framed by cross-motions for summary judgment of the plaintiffs, retired partners Frank H. Abbott and Vincent P. Haley, and defendant law firm Schnader Harrison Segal & Lewis LLP.[1] For the reasons set forth below, the plain-

---

1. The plaintiffs' motion does not address their claims for promissory estoppel and breach of duty of good faith. Although it appears that Schnader's motion originally was intended to address all three of the plaintiffs' claims, both sides acknowledge that the plaintiffs' promissory estoppel claim is not yet ripe for a decision. Transcript of oral arguments before the Honorable John W. Herron, January 8, 2001 (N.T.), at 37, 45. Moreover, the conclusion reached in this opinion

tiffs' motion on their breach of contract claim is granted, and Schnader's motion is denied.

## BACKGROUND

Schnader is a law firm founded in 1935 and headquartered in Philadelphia, Pennsylvania. Stipulation at ¶3; declaration of Ralph G. Wellington, Esq. at ¶3. Abbott's career at Schnader spanned 44 years, first as an associate for 11 years and then as a partner from 1960 through January 1, 1993. Haley likewise worked at Schnader for 40 years, as an associate from 1959, and then as a partner from 1968 until January 1, 1999.

On May 31, 1984, the parties entered into a partnership agreement that is at the center of the controversy in this case.[2] The agreement addressed a variety of issues of partnership management such as the partners' capital and drawing accounts, division of profits and election of the firm's executive committee. The parties' dispute, however, focuses on the relationship between an amendment provision in article II, section 2.06(d) and article VII, which grants retirement benefits for firm partners who have served for 25 years.

Article VII was titled "Retirement of partners" and provided for income benefits for retired partners who satisfied certain conditions. According to section 7.04,

(N.T.), at 37, 45. Moreover, the conclusion reached in this opinion removes a need to consider the plaintiffs' tertiary claim, based on Schnader's alleged breach of the duty of good faith. If Schnader prevails upon appellate review of this court's decision, however, it will be necessary to remand this matter for a trial on the plaintiffs' promissory estoppel claim.

2. The agreement is attached to the stipulation as exhibit K.

those partners who had given 25 calendar years of service to the firm were "entitled" to "retired partner payment benefits":

"Section 7.04. *Minimum years of service.* A partner must have at least 25 full calendar years of service with the firm as a partner or as an associate (which need not be consecutive) to be entitled to the full retired partner payment benefits provided under this article."

These "benefits" are more fully described in agreement section 7.02, which, prior to December 1999, read as follows:

"Section 7.02. *Income of a retired partner.* For each year a retired partner shall receive from the firm, payable money, an amount equal to 30 percent of the average of the partner's five highest annual shares of partnership income during the seven years prior to the effective date of his retirement (subject to section 7.03)[3] as shown on line 1, ordinary income (loss) (or any successor line or provision) on such partner's federal schedule K-1 (or any successor schedule), as adjusted for any amounts included on such fine paid by the firm that are not charged or credited to all partners on a per partner or proportionate basis,[4] for such years, subject to minimum

---

3. Section 7.03 of the agreement allows a partner who reaches the mandatory retirement age to continue as an active partner in "extended service" to the firm, if such service is approved by four members of the firm's executive committee. Any such extension has no bearing on the calculation of benefits received by the partner.

4. The original agreement referred to "the firm's federal income tax returns." The language referencing line 1 was substituted in March 1995. Stipulation, exhibit J at 3.

and maximum annual amounts of $50,000 and $100,000."[5]

In a totally different section, the agreement outlined "votes required for certain actions." Agreement §2.06. The vote required to amend the agreement was 75 percent . . . ." Agreement §2.06(e).[6] Both parties concede that under this provision only active partners may vote on amending the agreement. N.T. at 27; plaintiff's response memorandum at 2.

Under the benefits provisions of article VII, effective January 1, 2000, Abbott would have been entitled to receive benefits at an annual rate of $91,745.76 under the pre-December 1999 agreement. Stipulation at ¶23. This amount would have increased to $94,257.76 on March 31, 2000. *Id.* For Haley, the corresponding amounts would have been $91,990.96 and $94,509.67. *Id.* at ¶26.

On December 23, 1999, the partners enacted a series of amendments including one that revised section 7.02 to read as follows:

"(a)(i) A retired partner whose effective date of retirement was prior to January 1, 2000 shall receive from the firm the lesser of (x) the amount which he or she was receiving on an annual basis during calendar year 1999 and (y) $50,000, on an annual basis, payable monthly, during such retired partner's lifetime but not to exceed a period of 10 years from the effective date of his or her retirement . . . .

---

5. Other provisions of the agreement either adjust or limit the benefits. A complete list of these provisions is set forth in appendix three of the plaintiffs' motion.

6. Due to amendments to the agreement, this provision is now section 2.06(d).

"(b) Subject to the provisions of section 7.02(a), the amount of annual payments to a retired partner shall be initially calculated as 30 percent of the average of the partner's five highest annual shares of partnership income during the seven years prior to the effective date of his or her retirement (subject to section 7.03) as shown on line 1, ordinary income (loss) (or any successor line or provision) on such partner's federal schedule K-1 (or any successor form or schedule), as adjusted for any amounts included on such line paid by the firm that are not charged or credited to all partners on a per partner or proportionate basis, for such years." Stipulation exhibit P at 15-16.

The amendments have the practical effect of capping Abbott's and Haley's benefits at $50,000 per year and limiting the period of compensation to 10 years from the date of retirement of each. Stipulation at ¶27. Although the amendments were adopted in accordance with section 2.06(d) of the agreement, which allows the agreement to be amended with the consent of 75 percent of all partners, neither Abbott nor Haley consented to the adoption of the amendments. Stipulation exhibit P at 15; affidavit of Frank H. Abbott at ¶17. The plaintiffs filed a complaint in this matter on June 15, 2000. The complaint asserts causes of action for breach of contract, promissory estoppel and breach of duty of good faith. The parties are represented by very able counsel who agreed upon stipulated facts for disposition of the motions.

## DISCUSSION

The plaintiffs argue that the conditions set forth in article VII of the agreement constituted an offer to enter

into a unilateral contract. By serving the firm for 25 years and thus satisfying the conditions of section 7.04 in the agreement, the plaintiffs assert that they completed the requisite performance in response to this offer, forming a unilateral contract under which their rights to the benefits were fully vested. Because vested unilateral contract rights cannot be modified, they reason, the amendments are ineffective as to the plaintiffs, and Schnader's failure to pay the pre-amendment amounts is a breach of its contractual obligation. Plaintiffs' summary judgment memorandum at 4-5, 8-9; N.T. at 25-26.[7]

Schnader, in contrast, counters that there "are no 'vested benefits' under the partnership agreement. Rather, there is only an *expectation* that Schnader will pay to retired partners benefit amounts that are calculated under the agreement." Defendant's summary judgment memorandum at 15. (emphasis added) Schnader offers several arguments to support this assertion. First, it emphasizes that the claimed benefits are not supported by a fund but instead derive from the firm's income flow and are capped at 10 percent of the firm's yearly profit. Schnader likewise emphasizes that section 2.06(d) of the agreement contained a broad amendment provision that would allow for the amendment of the article VII benefits after a partner has retired.[8] Finally, Schnader asserts that nothing in contract law would render modification of the benefits improper. *Id.* at 15-17, 21; N.T. at 34-35.

---

7. Due to the dearth of relevant precedent, the plaintiffs support their argument with Pennsylvania precedent dealing with public and private pension funds and with precedent from other jurisdictions.

8. These arguments are addressed *infra.*

It is with this final argument that Schnader comes closest to addressing the plaintiffs' argument that, under accepted rules of contract analysis, their benefits could not be modified after they completed performance in response to the conditions set forth in article VII.[9] Pennsylvania cases addressing the amendment provisions of partnership agreements are rare, while those treating benefit provisions in such agreements are non-existent, making this a case of first impression. Guidance in resolving this issue, therefore, must be sought in Pennsylvania cases focusing generally on analysis of unilateral contracts, as well as from relevant cases from other jurisdictions.

### I. *Plaintiffs' Breach of Contract Claim Raises Issues of Law Ripe for Summary Judgment*

Pa.R.C.P. 1035.2 allows a court to enter summary judgment "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action." A court must grant a motion for summary judgment when a non-moving party fails to "adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor." *Ertel v. Patriot-News Co.,* 544 Pa. 93, 101-102, 674 A.2d 1038, 1042 (1996).

---

9. Schnader concedes that "this issue is one of contract law." Defendant's response memorandum at 4. Instead of addressing whether unilateral contract principles are applicable, however, it attempts to distinguish cases applying those principles by asserting that "the contract here is a partnership agreement, not an employment contract." *Id.* at 9.

A successful breach of contract action requires "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa. Super. 1999). (citation omitted)[10] There are no issues of material fact regarding any of these elements here, as the parties have included all relevant documents and facts in the stipulation. Consequently, the summary judgment motions on the breach of contract action raise issues of law ripe for review.

II. *Under Generally Accepted Principles of Contract Law, the Benefits Provisions of Article VII May Not Be Amended After Plaintiffs Performed the Required 25 Years of Service Where There Is No Explicit Reservation of the Right to Amend the Benefits After Performance*

A. Principles of Unilateral Contracts Apply to the Benefits Provisions of Article VII

The plaintiffs first argue that the benefits provisions constitute an offer to enter into a unilateral contract. N.T. 25-26. Pennsylvania law defines a unilateral contract as "a contract wherein one party makes a promissory offer which calls for the other party to accept by rendering a performance." *Bauer v. Pottsville Area Emergency Medical Services Inc.,* 758 A.2d 1265, 1269 (Pa. Super. 2000).[11] In *First Home Savings Bank v. Nernberg,* 436

---

10. Section 12.07 of the agreement states that it is governed by Pennsylvania law.

11. In contrast, "[b]ilateral contracts involve two promises and are created when one party promises to do or forbear from doing some-

Pa. Super. 377, 648 A.2d 9 (1994), the Pennsylvania Superior Court observed that "[u]nilateral contracts . . . are formed when one party makes a promise in exchange for the other party's act or performance. . . . Significantly, a unilateral contract is not formed and is, thus, unenforceable until such time as the offeree completes performance." 436 Pa. Super. at 387, 648 A.2d at 14.[12] A unilateral contract thus is formed, at the latest, when the offeree has performed completely.

Retirement benefit plans generally are regarded as unilateral contracts. See *Kemmerer v. ICI Amers. Inc.,* 70 F.3d 281, 287 (3d Cir. 1995) ("[a] pension plan is a unilateral contract"); *Conley v. Pitney Bowes,* 34 F.3d 714, 717 (8th Cir. 1994) ("pension and benefit plans are typically characterized as being unilateral contracts"); *Williams v. Cordis Corp.,* 30 F.3d 1429, 1432 (11th Cir. 1994) ("a pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years").[13] Here, if any type of con-

---

thing in exchange for a promise from the other party to do or forbear from doing something else." *First Home Savings Bank v. Nernberg,* 436 Pa. Super. 377, 387, 648 A.2d 9, 14 (1994).

12. This statement may appear contradictory, as it suggests that a unilateral contract is formed when a promise is made and when performance is completed. However, where, as here, there is no dispute that performance has been completed, *First Union* supports the conclusion that a unilateral contract has been formed.

13. Many of the cases addressing retirement benefit plans, including several of those cited in this opinion, treat plans governed by the Employee Retirement Income Security Act, 29 U.S.C. ch. 18. ERISA does not govern retirement benefit plans that apply solely to partners of a firm, as article VII does. See *e.g., McNeil v. Time Ins. Co.,* 205 F.3d 179, 189 (5th Cir. 2000) ("a plan in which the only participants

tract is to arise from the benefits provisions of the agreement, it is a unilateral contract: a partner has no obligation to fulfill the terms specified to section 7.04. Because the firm's promise to pay benefits was conditioned on a partner performing in accordance with the specified terms, article VII may serve as the basis for a unilateral contract.

## B. Article VII Is Properly Analyzed Separately Under Unilateral Contract Principles Because of Its Distinct Consideration

In arguing that article VII should be analyzed in terms of unilateral contract principles, the plaintiffs are implicitly suggesting that article VII may be analyzed independent of the rest of the agreement. If the signatories' intent as to the unity of an agreement is unclear from the agreement's language, Pennsylvania courts look to the apportionment of consideration. See *Shields v. Hoffman,*

---

are the owners or partners does not constitute an ERISA benefit plan"). However, interpretation of ERISA plans is governed by the "common-sense canons of contract interpretation." *Byrne's v. Empire Blue Cross & Blue Shield,* no. 98 Civ. 8520 (BSJ), 2000 WL 1538605, *5 (S.D.N.Y. Oct. 18, 2000). (citation omitted) See also, *Central States, S.E. and S.W. Areas Pension Fund v. Croger Co.,* 226 F.3d 903, 911 (7th Cir. 2000) ("federal common-law rules of contract interpretation apply when we consider a contract in the context of an ERISA claim"); *Kemmerer,* 70 F.3d at 286-88 (applying principles of unilateral contract law, not ERISA); *Grossman v. High Mark Inc.,* no. civ. 97-6925, 1999 WL 46613, at *2 (E.D. Pa. Jan. 6, 1999) ("[e]mployee welfare benefit plans governed by ERISA must be interpreted through federal common-law rules of contract interpretation"). In addition, both parties rely heavily on cases treating ERISA plans. As a result, the reasoning that courts have applied to ERISA plans is persuasive here.

416 Pa. 48, 53, 204 A.2d 436, 438 (1964) (allowing separate treatment of a contract's provisions where "the parties apportioned the consideration both as to subject matter and payment"); *Heilwood Fuel Co. Inc. v. Manor Real Estate Co.,* 405 Pa. 319, 328-29, 175 A.2d 880, 884-85 (1961) (provisions of a contract must be treated separately where "the consideration is apportioned, either expressly or by necessary implication"). In this case, the consideration of 25 years of service required in article VII is tied to the benefits alone and has no bearing on any other part of the agreement. As a result, article VII may be examined separately from the rest of the agreement and under the rules applicable to unilateral contracts.

Citing *Gladstone v. McHenry Medical Group,* 553 N.E.2d 1174 (Ill. Ct. App. 1990), Schnader appears to argue that section VII may not be treated as independent of the rest of the agreement. The facts[14] in *Gladstone,* however, are inapposite, even though it is the only case cited that addresses the effect of an amendment provision on retirement benefits provided in a partnership agreement. The contract at issue in *Gladstone,* in contrast to the Schnader agreement, provided for the payment of a 2 percent of each partner's partnership income

---

14. In *Gladstone,* a supplement to the partnership agreement required each partner to give 2 percent of his portion of the partnership profits to two senior partners. This additional income was to be paid to each of the two recipient partners until he reached the age of 65 and was in consideration for the two partners' past work in laying the basis for the partnership's development. Before the plaintiff-recipient partner turned 65 the remaining partners voted to delete the payment requirements in accordance with a provision in the agreement that allowed amendment by a majority vote of the partners.

to two senior partners until they reached the age of 65 in consideration of their past efforts in creating the partnership. The Schnader agreement differs markedly since it required the future performance of 25 years of service as a prerequisite for the retirement benefits.

In analyzing the agreement in *Gladstone,* the Illinois Appellate Court concluded, inter alia, that the benefits provision should not be analyzed separately, seemingly in part because the consideration for these special retirement benefits was past performance, rendering that portion of the agreement unenforceable:

"Generally, if the alleged consideration for a promise has been conferred prior to the promise upon which alleged agreement is based, there is no valid contract. Section S-2(c) explicitly states that the reason for the payment provision was the plaintiff's efforts prior to the establishment of the partnership agreement on November 1, 1960. None of the defendant doctors were partners prior to that date, and, thus, the efforts cited by plaintiff in section S-2(c) occurred prior to any promise or agreement by the partners." 553 N.E.2d at 1180. In contrast to the contract at issue in *Gladstone,* article VII includes consideration separate from the rest of the agreement, allowing it to be treated as an independent unilateral contract.

C. Under Pennsylvania Law, Retirement Payment Obligations Vest Upon Completion of Performance

Pennsylvania courts have established a number of basic principles to be used when interpreting a contract:

"The intent of the parties to a written contract is deemed to be embodied in the writing itself, and when

the words are clear and unambiguous the intent is to be gleaned exclusively from the express language of the agreement. . . . Indeed, 'the focus of interpretation is upon the terms of the agreement *as manifestly expressed,* rather than as, perhaps, silently intended.' " *Delaware Cty. v. Delaware Cty. Prison Employees Independent Union,* 552 Pa. 184, 189, 713 A.2d 1135, 1137 (1998). (citations omitted) (emphasis in original)

The plaintiffs contend that Pennsylvania contract law imposes an obligation to pay the retirement benefits once the right to receive the benefits has vested. This finds support under the general principle "that in Pennsylvania pensions are viewed as contractual rights." *Bilec v. Auburn & Associates Inc. Pension Trust,* 403 Pa. Super. 176, 183, 588 A.2d 538, 541 (1991).

To support their argument, the plaintiffs rely primarily on two cases dealing with vesting of public and private retirement payment obligations: *Retirement Board of Allegheny County v. McGovern,* 316 Pa. 161, 174 A. 400 (1934), and *David v. Veitscher Magnesitwerke Actien Gesellschaft,* 348 Pa. 335, 35 A.2d 346 (1944). In *McGovern,* the Pennsylvania Supreme Court emphasized that, in the public sector, retirement payments became vested once an employee had completed the requisite performance:[15]

---

15. The *McGovern* court examined legislation that required counties to contribute a portion of incoming taxes to the county pension fund. The defendants argued that the legislation's requirements were in violation of Article 2, Section 11 of the Pennsylvania Constitution (now Article 3, Section 26), which prohibited giving "any extra compensation to any public officer, servant, employe, agent or contractor, after services shall have been rendered."

"Until an employee has earned his retirement pay, or until the time arrives when he may retire, his retirement pay is but an inchoate right; but when the conditions are satisfied, at that time retirement pay becomes a vested right of which the person entitled thereto cannot be deprived: it has ripened into a full contractual obligation." 316 Pa. at 169, 174 A. at 404-405 (citing *Lynch v. United States,* 292 U.S. 571 (1934)).

The Pennsylvania Supreme Court subsequently extended the principles of retirement payment obligations to employment contracts of private employers in *David.* There, the court once again concluded that contractual pension rights became vested and could not be abrogated by laws passed after completion of performance.[16] Applying *McGovern* and *David,* the plaintiffs argue that article VII required Schnader to pay the plaintiffs their benefits as they were calculated at the time their right to the benefits had vested.

The principles outlined in *McGovern* and *David* have been embraced more recently by Pennsylvania courts in cases cited by neither party. In *Thelin v. Borough of Warren,* 118 Pa. Commw. 336, 338, 544 A.2d 1135, 1136 (1988), for example, the Commonwealth Court held that "[a]n employee's pension rights vest when he or she has

---

16. In *David,* the defendant corporation argued that anti-Semitic laws promulgated after the Anschluss of Austria in 1938 extinguished the plaintiff's right to receive a pension. The court relied on the portions of *McGovern* quoted *supra* and extended the principles behind retirement pay obligations to private employers. Ultimately, the court found that the plaintiff's pension had become effective prior to the laws promulgation and that the plaintiff's vested contractual rights to his pension could not be abrogated.

satisfied all prerequisites under the plan."[17] See also, *Bilec,* 403 Pa. Super. 176, 189, 588 A.2d 538, 544 (1991) (once an employee fulfilled both pension plan length of service and age requirements, his benefits vested); *Nelson v. Western Beaver County School District,* 89 Pa. Commw. 126, 129, 491 A.2d 964, 965 (1985) ("[a]t the time that . . . employees satisfy the conditions, the right to retirement benefits has vested and cannot be denied"); *Boyd v. Operating Engineers Welfare Fund of Eastern PA and Delaware,* 193 Pa. Super. 438, 443, 165 A.2d 289, 292 (1960) (trustees of union welfare fund could not limit payment of benefits retroactively).[18] This precedent thus complements the view that article VII was an offer and that the plaintiffs' right to receive the benefits vested as soon as they had completed performance.[19]

---

17. However, the court noted that, while a pensioner's plan may not be altered after vesting, the conditions for vesting may be modified "when such would enhance the actuarial soundness of the fund." *Thelin,* 118 Pa. Commw. at 338, 544 A.2d at 1136 (citing *Eisenberger v. Harrisburg Police Pension Commission,* 400 Pa. 418, 162 A.2d 347 (1960)).

18. Case law from other jurisdictions supports this general conclusion rather consistently. See *e.g., In re New Valley,* 89 F.3d 143, 150-51 (3d Cir. 1995) ("once the employee performs, the offer becomes irrevocable, the contract is completed, and the employer is required to comply with its side of the bargain"); *Albanese v. Pfizer Inc.,* no. 94-2223-KVH, 1996 WL 225192 at *5 (D. Kan. Mar. 19, 1996) ("[a] pension plan is unilateral contract which creates a vested right in those employees who accept its offer by continuing in employment for the requisite number of years"); *McHorse v. Portland Gen. Elec. Co.,* 521 P.2d 315, 318 (Ore. 1974) ("where the employee has satisfied all conditions precedent to becoming eligible for benefits under a plan, . . . the employee has a vested right to the benefits").

19. Although it does not address retirement benefits and neither party cites it, the plaintiffs' argument is advanced further by *Kornstein*

Schnader attempts to counter the plaintiffs' vesting argument in three ways. First, it argues, most of the plaintiffs' Pennsylvania cases involve the contribution of money into a fund. Here, in contrast, the plaintiffs have made no financial contribution in exchange for the benefits. Defendant's summary judgment memorandum at 15-16. Second, Schnader points out that none of the cases cited by the plaintiffs involves a partnership, where the relationship differs significantly from an employer-employee relationship. Third, Schnader seems to argue that the Pennsylvania cases do not specify the breadth of the amendment provision relied on or, in some cases, whether the benefit plan included an amendment provision at all, rendering them distinguishable from the instant case.[20]

---

v. Taylor, 68 D.&C.2d 7 (C.P., Phila.), affirmed, 229 Pa. Super. 751, 322 A.2d 369 (1974). There, the limited partners withdrew from the partnership with the expectation that their interest would be returned to them in five installments over the following 15 months, as mandated by the partnership agreement. However, eight months after the withdrawal, the remaining partners voted to dissolve the partnership and make payments to current and former limited partners on a pro rata basis only after firm debts had been paid. The court ultimately concluded that the plaintiffs' payment rights did not deal with ordinary matters in the course of the partnership business but rather concerned "basic rights of the 'limited' partners under their contract between themselves." 68 D.&C.2d at 11. As such, they could not be modified as to any limited partner without his consent. Other Pennsylvania cases that consider amendments to partnership agreements are unhelpful here. See e.g., Capiello v. Duca, 449 Pa. Super. 100, 672 A.2d 1373 (1996) (addressing failure to comply with statutory filing requirements in 15 Pa.C.S. §8512).

20. As a fourth argument, Schnader also attempts to distinguish the instant case based on differences applying to public and private employers. Schnader is correct that both McGovern and David address statutory modifications of retirement benefits and that constitutional

Schnader's distinction based on financial contributions is unpersuasive based on the clear language of the agreement. Schnader argues, for instance, that any entitlement to benefits must be determined "by examining the relevant contract documents on which the claim for benefits is based." Defendant's response memorandum at 4. The agreement states unambiguously that a retired partner is "entitled" to full benefits upon completion of 25 years of service, without any mention of a fund or payments as a condition for the benefits. In addition, Pennsylvania courts treat pension contracts no differently from any other contract, thus making a distinction based on the relationship between the parties involved largely irrelevant. See *e.g., Lowe v. Jones,* 414 Pa. 466, 200 A.2d 880 (1964) (looking to pension plan terms to reject action of foreign attachment); *Bilec,* 403 Pa. Super. at 183, 588 A.2d at 541 ("pensions are viewed as contractual rights"); *Levitt v. Billy Penn Corp.,* 219 Pa. Super. 499, 503, 283 A.2d 873, 875 (1971) (examining pension plan to define the limits of the trustees' power).[21]

---

considerations apply when addressing the claims of public employees. However, several cases involving private employers support the plaintiffs' arguments, thereby rendering the distinction unpersuasive. See *e.g., Bilec,* 403 Pa. Super. 176, 182, 588 A.2d 538, 541 (1991).

21. Schnader is correct in pointing out that the other cases in Pennsylvania and elsewhere address agreements whose sole purpose is to establish a pension plan and not benefits provisions included as part of a larger agreement. However, as discussed *supra,* the separate nature of article VII allows the court to consider the benefits provisions independently.

## D. Pennsylvania Courts Have Not Addressed the Effect of a Reservation of a Right to Amend a Benefits Provision in a Partnership Agreement

The issue of the reservation of the right to amend, however, is a significant distinction that has not been addressed by Pennsylvania courts.[22] Conceptually, it is linked to the issue of when an offer to enter into a unilateral contract can be terminated or revoked. Generally, an offer to enter into a unilateral contract can be terminated only by "(1) a counter-offer by the offeree; (2) a lapse of time; (3) a revocation by the offeror; or (4) death or incapacity of either party." *First Home Savings Bank,* 436 Pa. Super. at 388-89, 648 A.2d at 15 (citing, inter alia, *Vaskie v. West American Insurance Co.,* 383 Pa. Super. 76, 81, 556 A.2d 436, 438 (1989) and Restatement (Second) of Contracts §§36, 41 (1981)). There is, however, no case law on when a revocation, or, as here, a modification, must be made to be valid and, more specifically, whether it is valid after performance has been

---

22. In *Thelin,* the defendant was a municipal corporation that appears to have derived its right to amend the pension plan in question from its general authority to adopt borough ordinances, not from a specific amendment provision. Similarly, the *Bilec* court generally ignored the right to amend and focused on the elements required for the addition of a noncompetition provision to the pension plan: "[w]hile we are not in agreement with the appellants' blanket contention that all pre-ERISA forfeiture clauses are violative of the public policy of this Commonwealth, we do find that this particular forfeiture clause violates public policy of Pennsylvania in regards to the enforcement of covenants not to compete." 403 Pa. Super. at 182, 588 A.2d at 540. In both *Boyd* and *Nelson,* the court did not address what amendment provision, if any, was included in the pension plan. Consequently, each of these cases can be distinguished from the instant matter.

completed. It is therefore necessary to look to cases from other jurisdictions for guidance to determine when the retirement benefits provisions in an agreement can be amended or modified pursuant to a general amendment provision.

### E. Courts in Other Jurisdictions Have Taken Three Approaches to Benefit Plans or Agreements That Contain Amendment Provisions

Courts in other jurisdictions have taken three different approaches to benefit plans that include amendment provisions:

*"Amendment provision controls:* A reservation of the right to amend a promise of benefits effectively vitiates the promise by rendering it illusory. As a result, the offeree's performance cannot result in a unilateral contract, and the contractual right to receive benefits does not vest.

*"Benefits provision controls:* A promise of benefits cannot be negated by a reservation of the right to amend. Thus, the promise constitutes a promise not subject to amendment provisions elsewhere in the agreement, and the offeree's rights vest upon full performance.

*"Benefits provision controls unless explicit reservation (Kemmerer approach):* In general, a promise to pay retirement benefits trumps a general provision reserving the right to amend at any time. However, if the reservation of the right to amend after performance is explicit, there is no binding offer, and the offeree has no vested right to receive benefits."

## 1. *Amendment provision controls*

Under one approach, a reservation of the right to amend an agreement dominates over the promise of benefits and prevents the contractual right to receive benefits from vesting.[23] While this approach may seem severe, it is founded on the goal of encouraging employee benefit plans and the fear that "[e]xcessive restrictions on the ability of employers to make plan changes will encourage employers to eliminate the plans completely." Daniel M. Nimtz, *ERISA Plan Changes,* 75 Denv. U. L. Rev. 891, 927 (1998). See also, Peter M. Van Zante, *Mandated Vesting: Suppression of Mandatory Retirement Benefits,* 75 Notre Dame L. Rev. 125 (1999) (arguing against mandated vesting of ERISA retirement benefits).

---

23. This approach appears to have its roots in section 45 of Restatement (Second) of Contracts, comment b of which states that "a reservation of power to revoke after performance has begun means that as yet there is no promise and no offer." The comment offers the following, illustration of this principle:

"A, an insurance company, issues a bulletin to its agents, entitled 'Extra earnings agreement,' providing for annual bonus payments to the agents varying according to 'monthly premiums in force' and 'lapse ratio,' but reserving the right to change or discontinue the bonus, individually or collectively, with or without notice, at any time before payment. There is no offer or promise."

Although Pennsylvania has not adopted this part of section 45, the Third Circuit has quoted this language in predicting that the Pennsylvania Supreme Court would do so. *Transport Workers Union of Amer. v. SEPTA,* 145 F.3d 619, 624 (3d Cir. 1998). In addition, the decisions in several Pennsylvania cases have been based on other parts of section 45. See *e.g., Martin v. Capital Cities Media Inc.,* 354 Pa. Super. 199, 211, 511 A.2d 830, 836 (1986) (relying on section 45(1) and comment a).

A line of cases addressing benefit plans has recognized this approach, although few have adopted it unequivocally.[24]

## 2. Benefits provision controls

Under a second approach, the right to retirement benefits vests upon complete performance and prevents the

_____

24. See e.g., United States R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 174 (1980) ("railroad [retirement] benefits are not contractual and may be altered or even eliminated at any time"); Devlin v. Transportation Communications Int'l Union, 173 F.3d 94, 103 (2nd Cir. 1999) (a claim to vested welfare benefits is contradicted by the . . . unambiguous reservation in the plan documents of its right to amend the plan"); International Union, United Auto., Aerospace and Agric. Implement Workers of Amer. v. BVR Liquidating Inc., 190 F.3d 768, 773 (6th Cir. 1999) ("the inclusion of a 'reservation of rights' provision establishes that there was no intent for benefits to vest"); McGrath v. Rhode Island Retirement Bd., 88 F.3d 12, 17-18 (1st Cir. 1998) (recognizing that, "generally, . . . with supposed unilateral contracts . . . if the offeror expressly reserves the power to revoke the offer until the offeree's performance is complete, then the offer is illusory and cannot give rise to a unilateral contract," but noting exceptions); In re Unisys Corp. Retiree Medical Benefit Litigation, 58 F.3d 896, 903-904 (3d Cir. 1996) ("[w]here . . . the reservation of rights is broad and unequivocal, it will prevail over a promise of lifetime benefits"); Jensen v. SIPCO Inc., 38 F.3d 945, 950 (8th Cir. 1994) (in the context of a welfare benefit plan, "a reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits"); Berg v. Empire Blue Cross & Blue Shield, 105 F. Supp.2d 121, 128 (E.D.N.Y. 2000) ("in an appropriate case, a reservation of rights clause would be sufficient" to allow amendment of a retirement benefit plan at any time, but refusing to allow amendment); Campbell v. Precision Rubber Prods. Corp., 737 S.W.2d 283, 285-86 (Tenn. Ct. App. 1987) (employer permissibly reserved unqualified right to amend, suspend, or terminate welfare benefit plan, although reservation "may be thought harsh and unjust"). Gladstone v. McHenry Medical Group, 553 N.E.2d 1174 (Ill. Ct. App. 1990), discussed supra, could be considered to follow this line of cases,

modification of the benefits' terms thereafter. As noted by the First Circuit in *McGrath v. Rhode Island Retirement Board,* 88 F.3d 12 (1st Cir. 1998), "the principle that reserv[ing the] power to revoke means that there is no offer and no contract has not been applied consistently." 88 F.3d at 18. Indeed, in a number of cases, courts have deviated significantly from the no offer/no vesting rule:

"[W]hether a retirement plan is contributory or non-contributory and *even though the employer has reserved the right to amend or terminate the plan,* once an employee, who has accepted employment under such plan, has complied with all the conditions entitling him to participate in such plan, his rights become vested and the employer cannot divest the employee of his rights thereunder." *Cantor v. Berkshire Life Ins. Co.,* 171 N.E.2d 518, 522 (Ohio 1960). (emphasis added)[25] A review of

---

although the *Gladstone* court focuses much more heavily on consideration and the separate nature of the benefits provisions.

It is worth noting that most of those cases that rely on this position to any extent address employee welfare benefit plans. ERISA does not require vesting for welfare benefit plans as it does for retirement benefit plans. See *Jensen,* 38 F.3d at 949 (discussing difference in ERISA vesting requirements for retirement and welfare benefit plans). As a result, a retirement benefit plan is more likely to include language mandating that the benefits in question vest.

25. See also, *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234 (1978) (implicitly recognizing pension plan in which the employer reserved the rich to amend and to terminate as a contract); *International Association of Machinists and Aerospace Workers Div., AFL-CIO v. Masonite Corp.,* 122 F.3d 228, 233 (5th Cir. 1997) ("[a] reservation-of-rights clause in a plan document . . . cannot vitiate contractually vested or bargained-for rights. To conclude otherwise would allow the company to take away bargained-for rights unilaterally"); *Gilbert v. Doehler-Jarvis Inc.,* 87 F. Supp.2d 788, 794 (N.D. Ohio

relevant cases led the *McGrath* court to the following conclusion:

"[O]nce an employee fulfills the service requirements entitling him or her to retirement benefits under a pension plan, the employee acquires a contractual right to those benefits, and the employer cannot abridge that right despite its aboriginal reservation of a power to effect unilateral amendments or to terminate the plan outright." 88 F.3d at 18-19 (calling this "an emergent common-law rule").

### 3. *Benefits provision controls unless explicit reservation*

Both of these approaches, however, are flawed. Neither takes into account the specific language of the amendment or benefits provision in the specific agreement in question. Moreover, both imply extreme consequences: the first could serve to nullify retirement ben-

---

2000) (refusing to "countenance a rule that could permit a company to unilaterally take away contractually bargained-for rights"); *Black v. Bresee's Oneonta Dept. Store Inc. Sec. Plan,* 919 F. Supp. 597, 603 (N.D.N.Y. 1996) (employer's "attempt to exercise the discontinuance provision could have no effect on those participants who had already fully performed the terms of the agreement, but rather, could [a]ffect only those who had failed to fully perform under the agreement"); *Carr v. First Nationwide Bank,* 816 F. Supp. 1476, 1494 (N.D. Calif. 1993) ("[a] short general provision stating that [an employer] 'may' amend cannot operate to nullify numerous other specific provisions"); *Stopford v. Boonton Molding Co.,* 265 A.2d 657, 665 (N.J. 1070) ("[a] contract should not be read to make the employer's plan a mere ephemeron and the promise to pay a pension upon performance of the fixed terms a mere illusion"); *In re H.E. Butt Grocery Co.,* 17 S.W.3d 360, 370 (Tex. App. 2000) (agreement that reserved the right to amend or terminate the benefit plan was not illusory).

efits in spite of the recipient's completed performance and reasonable expectation that his/her benefits were secure. The second, in turn, would invalidate amendment provisions in retirement plans, regardless of their specificity or prominence, thereby depriving the partnership or plan provider of desirable flexibility.

Fortunately, a third, more moderate approach has been suggested by the Third Circuit in *Kemmerer v. ICI Americas Inc.,* 70 F.3d 281 (3d Cir. 1995): "even when a plan reserves to the sponsor an explicit right to terminate the plan, acceptance by performance closes that door under unilateral contract principles *(unless an explicit right to terminate or amend after the participants' performance is reserved).*" 70 F.3d at 287-88. (emphasis added)[26] The Third Circuit reached this conclusion and determined a benefits provider's right to terminate by focusing on principles of unilateral contracts and "by *construing the terms of the plan itself."* 70 F.3d at 288. (emphasis added) In addition, the *Kemmerer* court made specific reference to and use of Pennsylvania principles of contract interpretation, including the plain meaning rule. 70 F.3d at 289. Other cases have followed *Kemmerer's* holding.[27]

---

26. The difference between the absolute bar to amendments enunciated in *McGrath* and the more moderate *Kemmerer* approach has been noted by commentators. See Ethan Lipsig, *Are Plan Documents Still King? A Survey of Recent Unilateral Contract and Inadequate Disclosure Fiduciary Breach Challenges to Plan Terms,* 5 no. 4 ERISA Litig. Rep. 21, 22 (1996) (*"Kemmerer* recognized a limitation to the *Carr* theory that *Carr* had left unenunciated . . .: *Kemmerer* implicitly treated the unilateral contract theory as nothing more than a rebuttable vesting presumption, a presumption that can be overcome by a sufficiently explicit amendment/termination provision in the plan").

27. See *e.g., In re New Valley,* 89 F.3d 143, 151 (3d Cir. 1995) (a pension plan "may not be terminated unless an explicit right to termi-

The principles embraced in *Kemmerer* best comport with Pennsylvania precedent focusing on the terms of the contract under which the right to receive the pension arises. Moreover, the reasoning supporting the *Kemmerer* rule is convincing. On the one hand, it allows freedom to amend retirement benefits after a beneficiary or partner retires, so long as the agreement contains specific language that benefit provisions may be amended even after performance has been completed. In addition, it protects those who have retired from being deprived of

nate after the participant's performance is reserved"); *Lund v. Citizen's Financial Group Inc.,* no. CV-97-183-M, 1999 WL 814341 at *19 (D.N.H. Sept. 30, 1999) ("[o]nce [an employee's] performance has been completed, the employer cannot terminate or amend the plan unless it has explicitly reserved the right to terminate or amend after performance"); *Benham v. Lenox Sav. Bank,* 26 F. Supp.2d 231, 239 (D. Mass. 1998) (employer could terminate benefits contract after employee's retirement "if an explicit right to terminate or amend after the participants performance is reserved"). *Amatuzio v. Gandalf Sys. Corp.,* 994 F. Supp. 253, 266 (D.N.J. 1998) (a rule other than that adopted in *Kemmerer* "would lack any basis in contract law and would render the employer's promise under the unilateral contract wholly illusory"). Cf. *Sprague v. General Motors,* 133 F.3d 388, 401 (6th Cir. 1998) (where employer "unambiguously" reserved the right to amend or terminate a plan, it was free to do so); *Finnell v. Cramet Inc.,* 289 F.2d 409, 413 (6th Cir. 1961) (where defendant acted in accordance with an express reservation of the power to amend a pension plan, amendment did not breach plaintiffs' legal rights); *Aiena v. Olsen,* 69 F. Supp.2d 521, 533 (S.D.N.Y. 1999) (after an employee has retired, an employer's right to amend a "top hat" retirement plan "depends upon the clarity with which the plan reserves that right"); *In re Consolidated Mut. Ins. Co.,* 566 N.E.2d 633, 634 (N.Y. 1990) (where provision reserving the right to amend benefits plan was ambiguous, employees were able to show that benefits were not terminable); *Wyss v. Innskeep,* 699 P.2d 1161, 1165 n.5 (Ore. App. 1985) (employer could not modify a bonus plan after employee had qualified "in the absence of a clear statement in the bonus plan of the right to do so").

the pension on which they were depending, unless the amendment provision makes it sufficiently plain that any such reliance was unwarranted.[28] Based on the foregoing, the plaintiffs' right to receive the benefits has vested unless the firm explicitly reserved the right to amend the benefits provisions after the plaintiffs had fully performed.

### F. Under the *Kemmerer* Test, Article VII May Not Be Amended Because the Agreement Lacks a Specific Reservation of the Right to Amend Retirement Benefits Where Performance Has Been Completed

A review of the agreement reveals no reservation that meets the requirements of *Kemmerer.* While the right to amend set forth in section 2.06(d) is broad and unambiguous, there is no explicit mention of the benefits provision, let alone the right to modify benefits after a partner has retired and completed 25 years of service. The absence of an explicit reservation can be contrasted with the repeated and explicit use of strong promissory language throughout article VII that a retired partner "shall receive" and is "entitled" to the benefits.[29] Thus, the benefits provisions constituted an offer, and the plaintiffs' right to receive their benefits vests upon full compliance with the offer's terms.

---

28. Ironically, each party argues that *Kemmerer* supports its position. See plaintiffs' summary judgment memorandum at 9; defendant's response memorandum at 7.

29. This language is complemented by the notes to Schnader's financial statements, which indicate that the benefits are "guaranteed . . . throughout the remainder of [the retired partners'] lives." Affidavit of Vincent Haley exhibits a-1-a-13.

The particular facts presented by Schnader as to the agreement's history do not alter this result. For example, Schnader claims exceptions to section 2.06(d) have been carved out explicitly, such as the requirement in the original agreement that amendments to death benefits provision for Bernard G. Segal required his approval. Stipulation exhibit B §2.06(e). Thus, Schnader maintains, the right of any partner or group thereof to block amendments has been spelled out explicitly in the past, and the absence of a provision requiring the approval of retired partners for changes to their benefits makes such approval unnecessary.

Schnader also asserts that it has been understood throughout the agreement's history that the agreement could be amended to reduce benefits and alter payments to retired partners.[30] This history, Schnader submits, establishes the precedent of limiting the rights available to

---

30. Schnader highlights several examples of this. In 1993, the partners approved an amendment that changed the default period over which the firm would return a retired partner's capital account from six months to three years. Stipulation exhibit H at 2-3. Then, in 1995, partners approved two amendments. The first 1995 amendment ordered the use of the amount of line 1 on a given partner's schedule K-1, as adjusted, instead of the amount on the firm's federal income tax returns, when determining the partner's previous annual shares under section 7.02. Stipulation exhibit J at 3. The second 1995 amendment limited retired partners' participation in benefit programs to non-group insurance programs. *Id.* at 4. This amendment also granted the firm's executive committee discretion in allowing retired partners administrative assistance, while the earlier version had given such assistance to retired partners as of right. *Id.* Last, an amendment in 1997 reduced benefits for partners retiring after 1997 by 2.5 percent for each year of service after 1997 and adjusted the 10 percent cap on aggregate benefits to all retired partners to ensure that pre-1997 retired partners would not receive a windfall. Stipulation exhibit L at 1-3.

retired partners after the partners in question have already retired.

These arguments are ultimately unpersuasive. While the Segal provision and the other amendments illustrate the general application of section 2.06(d), the issue is not whether an amendment provision is generally applicable to other parts of the agreement. Rather, the key question under the *Kemmerer* test is whether the amending party can meet its burden of showing an explicit reservation of the right to amend benefits provisions where performance has been completed.

Moreover, the details of the amendments to the agreement are not particularly significant. The 1993 amendment, for example, made no change in substantive rights of retired partners. The alteration affected only the default period for repayment of capital, and under the pre- and post-amendment versions, the period could be extended or shortened by the firm's executive committee. Similarly, the 1997 amendment had no impact on previously retired partners, as it affected only those partners who retire after the amendment's enactment and limited pre-1997 retired partners to the benefits they would have received prior to the amendment. While these facts may show that the plaintiffs were aware of section 2.06(d), they do not constitute an explicit reservation of the right to amend article VII after the conditions in section 7.04 have been satisfied.

Of the provisions cited, only the 1995 amendments can be said to have had an effect on partners who had already retired. However, most of the changes made in those amendments affected the retired partner's support staff and nominal relation to the firm. In addition, there

is no indication that the limitation on participation in benefit programs or the move to a K-1-based calculation had any practical effect. Thus, Schnader's extensive discussion of amendments to the agreement is not persuasive, and, because the examples Schnader cites do not address whether it explicitly reserved the right to modify article VII, they are not relevant.

For all of these reasons, the court concludes that once Abbot and Haley completed the requisite 25 years of service, their retirement benefits could not be amended pursuant to section 2.06(e) because it did not explicitly reserve the right to amend such benefits.

### G. Because the Plaintiffs Completed the Performance Required by Article VII, Schnader Had a Contractual Duty To Pay Their Retirement Benefits

There is no dispute that Abbott complied with the terms of section 7.04 prior to the enactment of the amendments. By the end of 1974, Abbott had given 25 calendar years of service to the firm. Stipulation at ¶1. At that point, his rights to the benefits vested.

In Haley's case, Schnader asserts that performance of section 7.04's terms was not completed prior to December 1999 because he and Schnader had agreed to a year of extended service through 1999. *Id.* at ¶24. However, section 7.04 imposes no requirement that a partner retire before becoming eligible for the benefits. Rather, the only condition for receiving the benefits is 25 years of service to the firm.[31] Haley completed his performance of

---

31. This comports with the Pennsylvania Supreme Court's holding that a person is eligible for retirement pay when she has satisfied the

this requirement in 1984, 15 years before the amendments were adopted. *Id.* at 2. As a result, Haley satisfied the requirements for receiving the benefits in 1984.

Prior to the amendment's enactment, section 7.04 required Schnader to pay Haley retirement benefits at an annual rate of $91,990.96 effective January 1, 2000. Stipulation at ¶26. This was to increase to an annual rate of $94,509.67 on March 31, 2000. *Id.* Abbott, in turn, was entitled to the corresponding amounts of $91,745.76 and $94,257.76. Stipulation at ¶23. As discussed at length *supra,* the amendments are ineffective as to Haley's and Abbott's benefits, and Schnader had a duty to make the full pre-amendment payments.

## H. Because Schnader Breached Its Duty to Pay the Plaintiffs Their Full Benefits, Resulting in Damage to the Plaintiffs, the Plaintiffs' Motion Must Be Granted and Schnader's Motion Denied

Schnader has failed to comply with its duty under the agreement to make retirement payments to the plaintiffs in the full pre-amendments amounts. Since January 1, 2000, Haley and Abbott have been receiving benefits at an annual rate of $50,000, below the rate to which they are entitled. Stipulation at ¶27. Thus, Schnader has breached its duty to pay the benefits arising out of the agreement.

Schnader's breach has undoubtedly caused the plaintiffs damage, as the plaintiffs have received less than the amount of benefits to which they were entitled. The plain-

---

conditions for retirement, not when she actually retires. *Harvey,* 392 Pa. 428, 141 A.2d at 201; *McGovern,* 316 Pa. at 168, 174 A. at 404.

tiffs therefore have satisfied all the elements necessary for a breach of contract claim, requiring that their motion be granted and Schnader's motion be denied.

## CONCLUSION

Because the agreement does not explicitly reserve Schnader's right to amend the benefits provisions after a partner has fully performed, the plaintiff's rights to their benefits have vested and cannot be modified unilaterally. Schnader's failure to comply with its obligation to pay the plaintiffs' full benefits is a breach of its duty under the agreement and has caused the plaintiffs damage. Accordingly, the plaintiffs' motion is granted and Schnader's motion is denied.

## ORDER

And now, February 28, 2001, upon consideration of the parties' motions for summary judgment in the above captioned matter, all responses thereto, the stipulation and oral arguments made by the parties on January 8, 2001 and in accordance with the opinion being filed contemporaneously with this order, it is hereby ordered and decreed that the plaintiffs' motion is granted and the defendant's motion is denied. The defendant is directed to pay plaintiffs all amounts that they would have been paid under article VII of the 1984 partnership agreement as calculated prior to the December 23, 1999 amendments and to continue to make future payments pursuant to the terms of that agreement as it existed prior to the December 23, 1999 amendments.